IN THE UNITED STATES DISTRICT

COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Civil Action No. 2:11 cv-05045-ER

. . . . . . . . . . . . . . . . . . . .
GARY CHRISTY,
        Plaintiff

Vs.

EOS CCA,
        Defendant
. . . . . . . . . . . . . . . . . . . .

DEPOSITION OF *JOHN F. BURNS, JR*, taken on behalf of the Plaintiff pursuant to Notice, before Carol DiFazio, CSR: #106293, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of EOS CCA, 700 Longwater Drive, Norwell, MA, on Thursday March 15, 2012, commencing at 1:30 p.m.

APPEARANCES:
JACOB GINSBERG, ESQ., of Kimmel & Silverman, P.C., 30 East Butler Pike, Ambler, PA 19002, on behalf of the Plaintiff.

ANDREW M. SCHWARTZ, ESQ., of Marshall, Dennehey Warner, Coleman & Goggin, P.C., 1845 Walnut Street, 17th floor, Philadelphia, PA 19103 on behalf of the Defendant.

ALSO PRESENT:  Susan Giordano, Vice President, Compliance and Risk Management, EOS CCA.

---

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Mr. Burns | 3 | 60 | | |

**E X H I B I T S**

| Ex. No. | Description | Page |
|---|---|---|
| 1 | Letter/Notice of Collection Placement | 29 |
| 2 | Answer to Plaintiff's Complaint with Affirmative Defenses by Defendant | 36 |
| 3 | Defendant EOS CCA's Answers and Objections to Plaintiff Gary Christy's Interrogatories | 50 |
| 4 | Defendant EOS CCA's Responses and Objections to Plaintiff Gary Christy's Request for Production of Documents | 59 |

---

3

P R O C E E D I N G S

MR. GINSBURG:  I do not have any stipulations.

MR. SCHWARTZ:  This deposition is being conducted under a matter in Pennsylvania and I just want to make sure that we reserve every objection other than form and privilege and obviously we have the typical other stipulations.

MR. GINSBURG:  That's fine.

*JOHN FRANCIS BURNS*, Jr., having been satisfactorily identified and duly sworn by me, a Notary Public in the Commonwealth of Massachusetts, was examined and testified as follows:

**Direct Examination**

Q.   (By Mr. Ginsburg) So Jacob Ginsburg, I am here for the Plaintiff, Gary Christy, and once again here with Kimmel & Silverman.  I ask the deponent Mr. Burns.  Can you please state your full name?

A.   My full name is John Francis Burns, Junior.

Q.   And Mr. Burns, what is your position with EOS CCA?

A.   I'm the vice-president of corporate services.

---

4

Q.   And have you ever been deposed before, Mr. Burns?

A.   Yes.

Q.   Approximately how many times?

A.   12.

Q.   12 times, is that precise or approximate?

A.   That's approximate.

Q.   Have you ever been deposed for an FDCPA matter?

A.   Yes.

Q.   And how many times do you think you have been deposed for an FDCPA matter?

A.   The depositions that I referenced were relating to FDCPA.

Q.   All of the depositions?

A.   Right.

Q.   And how many of these depositions have been in the last year?

A.   Maybe, I don't know the exact number.  I would say 3.

Q.   Three depositions.  And do you remember do you know the names of the cases for which you have been deposed?

5

1    **A.**  I don't recall them.

2    **Q.**  And they were all on behalf of EOS CCA,

3  correct?

4    **A.**  That's correct.

5    **Q.**  Thank you.  Now since you're familiar with

6  depositions, I know this might be redundant to you,

7  but do you understand that although we're in an

8  informal setting that your answers must be truthful?

9    **A.**  Yes.

10    **Q.**  And Mr. Burns, are you under the influence

11  of any drug or alcohol that would impair your

12  ability to be truthful or recall events and

13  occurrence accurately?

14    **A.**  No.

15    **Q.**  And just to be clear, I don't want you to

16  guess or estimate anything.  If you don't know

17  that's fine to say "I don't know."  If at any time

18  you want a break, please just let me know.  But I do

19  ask that you not take a break in the middle of an

20  answer or before an answer.  And as you probably

21  know, any discussions that you have with

22  Mr. Schwartz today or during this deposition are not

23  subject to the attorney/client privilege that

6

1  normally is in effect.  Do you understand that?

2    **A.**  Yes.

3    **Q.**  And just so the court reporter can get

4  everything accurately, I also ask that you wait for

5  me to complete my questions and you try not to speak

6  at the same time as me.  And if we start to speak at

7  the same time that we'll have to backtrack and do

8  things orderly.  Do you understand that?

9    **A.**  Yes.

10    **Q.**  Thank you.  Now, you understand that you're

11  here subject to a deposition notice for the

12  corporate representative of EOS CCA for Gary

13  Christy's claim against the EOS CCA?

14    **A.**  Yes.

15    **Q.**  Did you bring any documents with you to

16  today's deposition?

17    **A.**  Yes.

18    **Q.**  I'm sorry.  I'm having trouble hearing.

19    **A.**  Yes.

20    **Q.**  Thank you.  Which documents did you bring

21  with you today?

22    **A.**  I have copies of the notice of taking of

23  deposition.  I have copy of an email from Attorney

7

1  Schwartz to me.  I have the defendant's EOS CCA's

2  answers and objections to the plaintiff's

3  interrogatories.  I have got a copy of the responses

4  and objections to the plaintiff's request for

5  production of documents.  I've got answers to the

6  complaint with affirmative defenses.  And I've got

7  some copies of correspondence that were sent to the

8  attorney of -- from our firm to Kimmel & Silverman

9  that were mailed back, well, mailed back a little

10  while ago.  And then I have a folder that has

11  information, other information relative to the case

12  which is mostly copies of the same documents I just

13  referenced.  And basically that's it.

14    **Q.**  Now, the email that you received from

15  Mr. Schwartz, what is the subject matter of this

16  email?

17    **A.**  It's just --

18        MR. SCHWARTZ:  I am going to object.

19  That's privileged communication.

20        If you want to give a general

21  description of the most general detail that's fine,

22  otherwise I reserve the objection.

23    **A.**  Basically it was forwarding the email from

8

1  Attorney Ginsburg to Andrew Schwartz saying that was

2  going to be done today and sorry for the short

3  notice.  So that was forwarded to me.  So I made a

4  copy of that so I had that to refer to.

5    **Q.**  I remember that email.  We'll move on.  And

6  these were all documents that you reviewed in

7  preparing for this deposition?

8    **A.**  Yes.

9    **Q.**  And I am going to start of with some

10  background about you, Mr. Burns.  You said your full

11  name is John Francis Burns?

12    **A.**  Junior.  That is correct.

13    **Q.**  John France Burns, Junior.  What is your

14  current business address?

15    **A.**  700 Longwater Drive, Norwell,

16  Massachusetts.

17    **Q.**  And you are the vice-president, can you

18  state your position one more time?

19    **A.**  Vice-president of corporate services.

20    **Q.**  And how long have you had this position?

21    **A.**  About 17 years.

22    **Q.**  So you have been -- has the position always

23  had the same name?

9

1    A.    I've had this title but I had additional
2    responsibility for part of that period of time.  So
3    I would have been also identified as senior
4    financial officer but at the current time and for
5    the last six years I have not held that position.
6        Q.    And you are a director of EOS CCA?
7        A.    No.
8        Q.    Are you an officer?
9        A.    Yes.
10       Q.    And how many officers are there for EOS
11   CCA?
12       A.    I don't know the exact number.
13       Q.    Can you approximate?  Is it 20, 10 --
14       A.    20.
15           MR. SCHWARTZ:  Objection.  Sorry.  Hold
16   on.  I am going to put an objection on the record.
17   You can answer if you can.
18           MR. GINSBURG:  What is the basis of the
19   objection?
20           MR. SCHWARTZ:  The basis of the
21   objection is this:  Where are you going with this?
22   I don't want to traipse on any confidential
23   proprietary information.  If you're asking him to

10

1    disclose other officers, I am going to instruct him
2    not to answer.  In that case with the objection in
3    place marked for later on.  If he can answer that's
4    fine.
5            MR. GINSBURG:  I'm not asking for any
6    confidential information.
7        Q.    So there are approximately 20 officers of
8    EOS CCA.  And who is the president of EOS CCA?
9        A.    Paul Leary, junior.
10       Q.    Paul Larry.  And is he also in Norwell,
11   Massachusetts?
12       A.    Yes.
13       Q.    And EOS CCA is that a publicly traded
14   company?
15       A.    No.
16       Q.    It's not.  It's privately held?
17       A.    That's correct.
18       Q.    And is it a subsidiary of any publicly
19   traded corporation?
20       A.    No.
21       Q.    And what does EOS CCA stand for?
22       A.    The initials EOS were from the German
23   parent company of ours, and CCA are the initials

11

1    that symbolized Collection Company of America which
2    was the original doing business title for this
3    company.  So the combination of the new parent EOS
4    with our existing CCA became EOS CCA.
5        Q.    And is the EOS company, is that still a
6    parent company for EOS CCA?
7        A.    Yes.  The parent company is EOS Holding USA
8    to Collecto which is the corporate name for the
9    entity that does business as EOS CCA.
10       Q.    Sorry for my lack of understanding.
11   Collecto is currently the parent company or is it an
12   alterego?
13       A.    Collecto is the corporation.  It's
14   Collecto, Incorporated, doing business as EOS CCA.
15       Q.    Thank you.  So approximately how many
16   employees does EOS CCA have?
17       A.    1080.
18       Q.    And where does EOS CCA employ these
19   individuals?
20       A.    There is 10 offices throughout the United
21   States.  There are five offices in Canada.  There is
22   one office in India.
23       Q.    And how many, approximately how many people

12

1    work in each office?  I imagine it varies greatly.
2        A.    It varies greatly.
3        Q.    How many are there -- are there managers in
4    every office or supervisors?  How do the collectors,
5    how are they organized and trained in each office?
6        A.    There are managers of each office,
7    directors, and within the staffing at the office
8    there is typically a training manager that does
9    training for the collection staff?
10       Q.    And the debt collectors are the employees,
11   do they all have to be physically at the office, or
12   can they work from home or from remote access?
13       A.    No one is allowed to work remotely.  They
14   all must be in the office.
15       Q.    And India and Canada are the only
16   nonAmerican or nonUnited States of American offices
17   for EOS CCA?
18       A.    Yes.
19       Q.    And approximately how many employees does
20   EOS CCA have in Canada?
21       A.    125.
22       Q.    And how many in India?
23       A.    50.

13

1    Q.   And onto back about yourself.  Can you
2    describe your educational background starting with
3    high school, college, and any postgraduate education
4    you've received, Mr. Burns?
5    A.   I graduated from Weymouth High School in
6    Massachusetts.  I graduated from Columbia College in
7    the City of New York.
8    Q.   Which year was that?
9    A.   1968.
10    Q.   Do you have any postgraduate education?
11    A.   I attended Babson College in Wellesley,
12    Massachusetts.  I completed about 50 percent of the
13    MBA program.
14    Q.   But you do not have your MBA?
15    A.   That's correct.
16    Q.   And what was your degree in at Columbia?
17    A.   Anthropology.
18    Q.   How long have you worked, Mr. Burns, in the
19    collection industry?
20    A.   I worked for a period of time after I got
21    out of college for a company called Dun & Bradstreet
22    which provided collection services as well as credit
23    reporting services.  That was for a period of four

14

1    years.  And I have been associated with EOS CCA for
2    a period of 20 years.  17 of that as a full-time
3    employee, three years beginning as a director of the
4    company.
5    Q.   And you said you have been vice-president
6    for those 17 years?
7    A.   Yes.
8    Q.   And for the first three years can you
9    describe your position in a little more detail?
10    A.   Well, the first three years that I was
11    affiliated with the company I was an outside
12    director.  I was on the board of directors but not
13    an employee of the company.
14    Q.   You got on as a director based on your past
15    experience in collections?
16    A.   It was based on experience in other areas
17    of business.
18    Q.   Could you briefly describe your current
19    duties as vice-president?
20    A.   My current duty is to oversee compliance
21    and risk management.  I am also involved with
22    facilities and strategic planning and the debt
23    purchasing activities of the company.

15

1    Q.   So you are involved in compliance that
2    assumedly includes FDCPA and FCRA compliance?
3    A.   Yes.
4    Q.   And what else does compliance entail?
5    A.   Compliance approves all tactics, scripts,
6    letters, that would be used by the operations staff;
7    and compliance will also review contracts,
8    agreements with vendors, clients, anything to do
9    with contracts or procedures that the company must
10    follow.
11    Q.   And you're also involved in debt
12    purchasing, correct?
13    A.   That's correct.
14    Q.   Now, the debt that EOS CCA purchases, let
15    me backtrack.  EOS CCA collects on debts that the
16    company owns, correct?
17    A.   Partially, yes.
18    Q.   And do they also collect on behalf of third
19    party creditors?
20    A.   Yes.
21    Q.   So they collect on debts that they own and
22    that they do not own?
23    A.   That's correct.

16

1    Q.   And could you give an approximate breakdown
2    of what percentage of the debts EOS CCA owns?
3    A.   The current activity for the debt the
4    company owns is about 5 percent.
5    Q.   And the other 95 percent are on behalf of
6    third party creditors?
7    A.   That's correct.
8    Q.   And are the debts that EOS CCA collects,
9    are they exclusively consumer debts or are they also
10    business debts?
11    A.   The majority is consumer.  There are some
12    business debts.
13    Q.   Are those separated, sorry, are those
14    categorized separately, or do they all get lumped
15    together?
16    A.   They're usually separate.
17    Q.   And are there separate collectors for
18    business debts than consumer debts?
19    A.   Yes.
20    Q.   Now staying with general, is part of the
21    FDCPA training that EOS CCA does is there training
22    regarding contacting third parties to collect debts?
23    A.   Yes.

17

1    **Q.**   Now that training, does that involve
2   manuals or seminars?  How does that training exactly
3   take place?
4        MR. SCHWARTZ:  Objection as to form.
5   For a number of reasons.  The first reason is are we
6   talking about telephone calls or are we talking
7   about a letter sent to a debtor?
8    **Q.**   This is general.
9        MR. SCHWARTZ:  The point is are you
10  asking for manuals with respect to telephone
11  communications or written communications because
12  there is obviously a big difference.
13       MR. GINSBURG:  I was asking generally,
14  but since you raise that objection I should make it
15  more specific to this case.
16   **Q.**   Is there training regarding letters sent to
17  third parties?
18   **A.**   Is there training -- excuse me.  We don't
19  send letters to third parties.
20   **Q.**   Is there training done in order to avoid
21  that?
22   **A.**   There is training done for all aspects of
23  our business, but there is not specific training on

18

1   what we should not do.  We send letters to the
2   consumer.  We don't send letters to third parties.
3    **Q.**   And could you give a general description of
4   the training done to ensure that does not take
5   place, if there is any?
6    **A.**   Well, our debt is owed by a specific
7   consumer and correspondence would be directed to
8   that consumer regarding that debt.  So that's basic
9   training.  We do not, the only communication with
10  the third party would be for location information.
11  And that's not done by the mail.  That's done by a
12  phone call.
13   **Q.**   And what type of training is done to the
14  collectors?  I mean are there seminars, guidebooks?
15       MR. SCHWARTZ:  Objection as to form.
16  You can answer if you can.
17   **A.**   The collectors go through formal training
18  when they're hired.  They go through periodic
19  training.  They go through monitoring and audits on
20  phone calls.  So the training starts from day 1.
21  It's an ongoing process as long as they're an
22  employee of the company.  It's a combination of
23  classroom.  It's a combination of instructions from

19

1   trainers.  It's manuals, any of those are all part
2   of it.
3    **Q.**   And how long is the training when, for
4   instance, if I were to start with EOS CCA as a debt
5   collector, how long would the training process be
6   before I start making phone calls and sending
7   letters or writing letters, et cetera?
8    **A.**   You wouldn't write letters.  Collectors
9   don't write letters, but the initial training in the
10  classroom is 3 days.  Then they must pass a test
11  before they're deemed to be approved to go on the
12  floor, and then they work with an existing
13  experienced collector for a couple days to make sure
14  that they understood the classroom training and
15  practical experience.  And then after possibly a
16  week to 10 days they might be in their own category
17  with business while being monitored by the manager.
18   **Q.**   Do the collectors get paid on commission
19  based on how much they collect from consumers?
20   **A.**   The collectors for the most part are paid
21  on an hourly wage and they can earn commissions if
22  they achieve certain thresholds in collection
23  dollars.  So they have the opportunity to earn a

20

1   bonus if they achieve a certain threshold.
2    **Q.**   Now you said that the letters were not
3   drafted by collectors.  Who does draft the letters?
4    **A.**   The letters are already drafted.  There is
5   no, nothing is created.  Letters are already
6   formatted, and when a consumer's account is assigned
7   to us, then we initiate letter 1 to send to the
8   consumer.  So the letter is already formatted.  We
9   are just putting in the name of the consumer into a
10  pre-formatted electronic transmission and it's sent
11  out by the person that manages the letters.  So the
12  collector doesn't send letters.
13   **Q.**   But you say that the letters were already
14  drafted.  Who is it, without revealing any trade
15  secret or anything, who is it who drafts this
16  letter?
17   **A.**   The compliance department has the ultimate
18  approval of the letter.  Whether, we have numerous
19  letters.  I can't say every letter was created by
20  compliance, but every letter is approved by
21  compliance.  There is occasions when our operations
22  group will want to create a new letter based on a
23  request from a client, but compliance has to approve

21

1  it before it can be put into the system.
2      Q.   And your clients, those are the third party
3  creditors for which EOS CCA collects?
4      A.   Yes.
5      Q.   You said that you put in the name and
6  address of the consumers.  How do you get these
7  names and how do you get these addresses?
8      A.   When the accounts are placed with us, from
9  the client, they give us an electronic file which
10  identifies that information.  It's among the fields
11  of information that they would supply to us.
12      Q.   Are there times where EOS CCA changes a
13  name or an address, for instance someone gets
14  married or someone moves?
15      A.   Yes.  The files are updated with any
16  current information that would make the file
17  accurate.
18      Q.   And who is it that updates the files?
19      A.   That information is sometimes done
20  automatically through the database information we
21  have, or if the information comes to a specific
22  collector, that collector may make the update on the
23  account.

23

1  done through an automated process.  The collectors
2  are answering phone calls, making some phone calls,
3  and doing that aspect of it.  But as far as the skip
4  tracing and the sending of letters, that information
5  is done more as an automated process.
6      Q.   Can you describe this automated process?
7      A.   The information is sent to a database that
8  would determine if there is no address associated
9  with the account it might look up an address, try to
10  identify an address or a phone number.  It goes
11  through the databases that are available in order to
12  provide current and accurate information on the
13  consumer.
14      Q.   Now are there live people associated with
15  this automated database, or is it strictly
16  computerized?
17      A.   Well live people run the computers and they
18  have to process the files.  But the information is
19  sent out in an electronic format to the vendor who
20  updates the information, and the updated information
21  populates the individual accounts.
22      Q.   Are there people that verify the accuracy
23  of this information.

22

1      Q.   And does EOS CCA use Lexis or any kind of
2  skip tracing technology to locate consumers?
3      A.   Yes.
4      Q.   And they look up their address in doing so?
5          MR. SCHWARTZ:  Objection as to form.
6      Q.   Do they look up the address, do the
7  collectors who are making changes and locating
8  consumers, do they search for the address when using
9  the skip tracing technology?
10      A.   I guess in some form.  I don't quite
11  understand your question.  Ask that question again.
12      Q.   Sorry about that.  What programs do
13  employees and representatives of EOS CCA use when
14  trying to locate a consumer's address?
15      A.   The accounts are sent out to an outside
16  vending source that would verify whether the address
17  that is associated with the account is a valid
18  address for the individual who is named as the
19  account owner.
20      Q.   So it's not EOS CCA employees that look
21  into this whether the address is correct?
22      A.   No.  The employees, the skip tracing, the
23  sending of letters, the validating of information is

24

1      A.   We don't know the accuracy of it until, if
2  we're given a phone number or address, we don't know
3  until someone responds to that, either by telling us
4  on a phone call that we have got a wrong number or
5  if we have a letter that is gone to a wrong address
6  someone calls us and says we're sending it to a
7  wrong address.  There is no way to verify before you
8  send it out.
9      Q.   There is no way of verifying it before you
10  send it out?
11      A.   We have millions of accounts.  We're not
12  sitting on phones trying to verify the information.
13  We are relying upon the databases that provide us
14  with the current information.  It's their job,
15  that's what their company does.  So we rely upon
16  their information as a good information to follow up
17  on the accounts until we find out otherwise.
18      Q.   What company is this, this vendor that does
19  this?
20      A.   There is different processes that are being
21  done.  Which process in particular are you talking
22  about?
23      Q.   The company that does the address location

25

1   and verification for consumers?
2       A.   That's done through our mailing company.
3   That Metro Media. I'm not sure of the exact name of
4   the company. But the letter vendor, when we provide
5   the file to them they run it through their database
6   to see if there has been a change of address or see
7   if the address is still valid through the U.S.
8   Postal Service database.
9       Q.   And when someone calls to say that a phone
10  number or an address is incorrect, then it would be
11  an EOS CCA employee that would make that change?
12      A.   That's correct.
13      Q.   And you said that EOS CCA has millions of
14  accounts. Those accounts are all debt with some
15  form, correct?
16      A.   Yes.
17      Q.   So EOS CCA collects millions of debts per
18  year?
19      A.   Collect as many as we can.
20      Q.   Attempts to collect millions of debts a
21  year?
22      A.   Yes.
23      Q.   Can you approximate how many accounts EOS

26

1   CCA has, again without revealing any trade secrets?
2              MR. SCHWARTZ: Objection to form.
3       A.   Active accounts.
4              MR. SCHWARTZ: Objection as to form. I
5   mean what time frame?
6       Q.   In a year. I'm sorry. I was not specific.
7       A.   Well, on an annual basis, the company may
8   receive 7 million in new accounts representing $6.8
9   billion dollars in debt that is owed.
10      Q.   And if unsuccessful in collecting, I guess
11  EOS CCA only owns about 5 percent of the debts,
12  correct?
13      A.   Yes.
14      Q.   And EOS CCA gets paid based on commission
15  for its clients?
16      A.   In some cases. There is other ways but
17  that's one way.
18      Q.   What other ways are there?
19      A.   We may get paid on a per account basis for
20  sending out a notice on behalf of a client. We
21  might provide staffing on site for a client project
22  where we get paid by the hour of the individual who
23  is providing the service. So there is different

27

1   types of arrangements that are made with each of the
2   clients.
3       Q.   Now, you said that, to backtrack a little
4   bit, you said that you don't know if an account's
5   information regarding an address is incorrect unless
6   someone calls and says this. Does that mean that
7   there are no safeguards to assure that letters are
8   not sent out to the wrong address?
9       A.   Well, the safeguard is we're using a vendor
10  who has validated address information through the
11  sources that are available to provide us with the
12  information. So that's our safeguard is that we're
13  not you're just sending the letters out blindly. We
14  are sending the letters out based on information
15  that has been provided by the client, or if that
16  information proves to be inaccurate information
17  provided by one of the companies that specializes in
18  providing accurate addresses on consumers.
19      Q.   Now to go to this, are there also, I know
20  that you probably have multiple consumers or files
21  with the same name. What does EOS CCA do to assure
22  that accounts with the same, where the consumer has
23  a name that is the same as another consumer, what is

28

1   done to keep the respective files or accounts
2   unique? I know that was a long question.
3       A.   I understand. For the most part when a
4   contact is made with the consumer, before
5   conversation is initiated relative to the debt, the
6   collector will verify that they have the right
7   consumer, usually by asking them if the last four
8   digits of their Social Security number is whatever
9   the number is, and then if they verify it and
10  indicate that yes, that is my Social, then they
11  assume they have the correct person.
12      Q.   Now does EOS CCA have the entire Social
13  Security numbers of consumers or just the last four
14  digits?
15      A.   Usually the entire number but not all
16  clients capture that information. So that can vary.
17      Q.   But you almost always have the last four
18  digits, at least?
19      A.   Yes. Most circumstances we have the whole
20  number.
21      Q.   What do you do to assure that you have the
22  correct prefixes and suffixes, such as junior,
23  senior, et cetera?

29

1    **A.**   We take the information that was provided
2    by the consumer to the creditor in setting up the
3    account and assume that they provided accurate
4    information.
5    **Q.**   But there are times where your client takes
6    down the information, correctly?
7    **A.**   I don't know that.  You're speculating.  I
8    don't know that for a fact.
9    **Q.**   You don't know of any times where any of
10   your clients have taken down information
11   incorrectly?
12   **A.**   I don't personally know of that, no.
13   **Q.**   To go to the specific obvious specific
14   account that is underlying the current FDCPA case,
15   you're familiar with the Gary Christy account?
16   **A.**   Yes.
17   **Q.**   And you are familiar with this June 14th,
18   2011, letter?
19   **A.**   Yes.
20   **Q.**   I am going to ask that this be marked EOS
21   CCA 1.
22            (Exhibit No. 1
23            Letter/Notice of Collection

30

1            Placement was marked for
2            Identification.)
3    **Q.**   This letter it's for the client AT&T
4    Mobility, correct?
5    **A.**   Yes.
6    **Q.**   How did this account come to EOS CCA?
7            MR. SCHWARTZ:  I am going to object at
8    this point.  I am going to object because 1, the
9    plaintiff in this case is not the debtor.  And as
10   far as if we start disclosing any information
11   relating to the debtor, that would become a
12   violation of the FDCPA.  We don't have one at
13   present.
14           So if you want a general description of
15   how these AT&T Mobility accounts come to EOS CCA,
16   that's fine.  But if you're asking specific as to
17   the debtor Gary Christy, then I am going to have to
18   assert an objection and instruct my client not to
19   answer out of concern that they will violate 1692 C.
20           MR. GINSBURG:  Understood.  That's
21   fair.  We are only asking for general information
22   about how AT&T Mobility accounts such as this end up
23   in the possession or as a client for EOS CCA.

31

1    **A.**   Would you ask your question again, please?
2    **Q.**   Sure.  How does EOS CCA obtain AT&T
3    Mobility accounts?
4    **A.**   There is an electronic transmission from
5    their office to our office which is in a file format
6    that identifies various characteristics of
7    information or various pieces of information
8    relative to the account so that we can initiate
9    collection activity.
10   **Q.**   And in those situations does EOS CCA get
11   the name as it was provided, or do they get the name
12   from the client?
13   **A.**   Yes.  The client supplies us with the
14   information at the time of the placement which would
15   include the name as appears on the account set up by
16   the consumer.
17   **Q.**   Does it also include the address?
18   **A.**   It includes, one of the fields is for an
19   address, yes.
20   **Q.**   And what are some of the other fields?
21   **A.**   Social Security number, telephone number,
22   general information of that type, when the account
23   was -- the last payment date on the account, the

32

1    service date, any information relative to the
2    account that would be of value for us in contacting
3    the individual.
4    **Q.**   And in this case or in these cases AT&T
5    Mobility is still the creditor, correct?
6    **A.**   That's correct.
7    **Q.**   But these accounts are in default?
8    **A.**   They place the account with us after the
9    account has not been paid for a certain period of
10   time.
11           MR. SCHWARTZ:  Let me put an objection,
12   just put an objection as to form.  I think the term
13   default has got a number of different meanings.  You
14   can answer as to the best of your ability.
15   **A.**   I don't know whether they deem them to be
16   in default or whether they just deem them to be past
17   due.  Default is more of a legal term.  You have to
18   ask them as to whether they consider them in
19   default.  But the service has been in these cases
20   the service has been terminated and the bill had
21   gone unpaid for a period of time, and then it gets
22   assigned to us for the collection.
23   **Q.**   In the letter that has been marked as EOS 1

33

1  do you see that it was addressed to Gary Christy at
2  30 East Butler Ave., in Ambler, Pennsylvania?
3      A.   Yes.
4      Q.   Now without revealing any confidential
5  information pertaining to the debtor or consumer's
6  account, how did EOS CCA get this address?
7      A.   The address was supplied by one of our skip
8  trace vendors that provided the address as a
9  potentially good address for the individual named.
10     Q.   So was the original address incorrect or
11 presumed to be incorrect?
12     A.   The original address that was associated
13 with the account was identified as not being a valid
14 address for the person of that name.  Therefore, the
15 skip trace process identified a new address as being
16 a good address.
17     Q.   And that was a skip trace, that skip trace
18 process that was done that was done in-house rather
19 than by a third party vendor?
20     A.   No.  It's done, most skip trace is done by
21 third-party vendors.
22     Q.   And was that the same company, metro media?
23     A.   No.  That company provides the letters.

34

1  The company that does the bulk of the skip trace
2  work for us is a company called LexisNexis.
3      Q.   Now does EOS CCA have a LexisNexis account?
4      A.   Yes.
5      Q.   So there are individuals working for EOS
6  CCA who enter this information into LexisNexis?
7      A.   The information is done on an automated
8  basis.  So it's not an individual saying I am going
9  to send this account over.  They're sent over in
10 batches.
11     Q.   So how is this address identified, the
12 original address that EOS has, how is that
13 identified as being incorrect?
14     A.   I'm not certain.  I can never tell from the
15 documents, other than when they do the address
16 verification prior to sending these notices out,
17 they will send back accounts that don't match up.
18 So I'm assuming that that was the case here,
19 although I can't be a hundred percent certain of
20 that.  But I'm assuming that that is the case here
21 because that is usually what, usually what happened.
22     Q.   What determines, you said it didn't match
23 up.  What determines if it does match up in other

35

1  words what do you mean by matching up?
2      A.   Well, the mailing house has all of the
3  addresses throughout the United States, and when a
4  name does not associate with an address, or the
5  address doesn't exist or we're given a partial
6  address or anything that would mean that the letter
7  was not going to be delivered, it would come back to
8  us as a file saying that there is either incomplete
9  information, inaccurate information, so that we
10 would not go to the expense of sending out a letter
11 at the cost of the letter to an address where it's
12 not going to get delivered or it's unlikely to get
13 delivered because it's incomplete or inaccurate or
14 doesn't associate with the name that has been
15 identified with the account.  So any -- okay.
16     Q.   All right.  You can finish, Mr. Burns.  I'm
17 sorry.
18     A.   I was going to say any time that the file
19 is incomplete and we can't send it out, it goes out
20 to be validated and verified through the LexisNexis
21 database.
22     Q.   And the answer to the complaint filed by
23 Mr. Christy, which the answer was filed on October

36

1  10th, 2011, I ask that that be marked EOS 2.
2          MR. GINSBURG:  Answer filed by EOS, by
3  the way.
4          (Exhibit No. 2 Answer to
5          Plaintiff's Complaint with
6          Affirmative Defenses by
7          Defendant was marked for
8          Identification.)
9      Q.   Now for Paragraphs 19, on Page 5 of the
10 Answer, the second sentence reads, "EOS CCA admits
11 and its records reflect that on or about June 14th,
12 2011, it addressed and sent a collection letter to
13 Gary Christy at an address provided by AT&T
14 Mobility." Now I read that correctly, didn't I?
15     A.   Yes.
16     Q.   That contradicts the statement that the
17 address was found by a LexisNexis search, doesn't
18 it?
19          MR. SCHWARTZ:  I am going to object to
20 that because again you're asking a question about
21 letters and at that time we didn't have a copy of.
22 It was supposed to have been attached as an exhibit
23 as you can see the remaining response, and I don't

37

1  mean to testify, but I think that's being a little,
2  frankly I think it's a little disingenuous where you
3  are asking, we don't have an original copy of the
4  letter.  We have templates.  So asking us to define
5  the contents of the letter without providing it in
6  the complaint, I think the argument is if there was
7  a mistake it was made by counsel we can correct it,
8  but it's based on the fact we didn't have the
9  information because it wasn't provided by the
10  plaintiff.
11     Q.   The answer says that its records reflect
12  that it was addressed and sent based on an address
13  provided by AT&T Mobility.  What was the basis and
14  what records reflect that this address was provided
15  by AT&T Mobility?
16     A.   The records that when the account was
17  placed with us, there was an address that was
18  provided with the account.  And the process, when
19  the process gets started to send letters, it's based
20  upon the letter that is provided by AT&T Mobility.
21  If in the process of that letter being sent it's
22  determined that it is not going to arrive at the
23  right place or it's an incomplete address, then the

38

1  data system, the skip tracing system is automated.
2  It then goes through the skip trace to get a good
3  address based on the preliminary information
4  provided by the client.  So that it would be mailed
5  to a more likely location where the consumer is
6  located.
7          So the process is started with the
8  information provided by AT&T Mobility.  It's just
9  when the end product goes out the door it may have
10  gone through different processes that update and
11  modify the information before it is actually sent
12  out the door.
13     Q.   The statement that or the portion of the
14  statement which says on or about June 14, 2011, it
15  addressed and sent a collection letter to Gary
16  Christy at an address provided by AT&T Mobility.
17  That statement is incorrect, isn't it?
18     A.   No.  I think the letter process was started
19  and the address provided by AT&T Mobility was the
20  address that was utilized.  What I'm saying,
21  letters, we might send a thousand letters to the
22  letter vendor, but they'll send a hundred back to us
23  saying that there is incomplete or inaccurate

39

1  information.  So we're not going to send these.  So
2  you're not bearing the cost of that.
3          Then those automatically go to the
4  LexisNexis for address verification and update.
5  It's not some individual looking at the letter
6  saying, I will do this, cross this out and change
7  that.  It's all done on an automated basis.  When we
8  say we're sending a letter out based on the address
9  by Mobility that was the starting point.  It's just
10  when the end product goes out the door at the mail
11  house it may have been modified because of new
12  information that would have corrected the
13  information that was with the account.
14     Q.   But this particular address was not
15  provided by AT&T Mobility, correct?
16     A.   That's correct.
17     Q.   Do you have a copy of the skip trace that
18  was done for Mr. Christy's account?
19     A.   No.
20     Q.   For this letter that was sent?
21     A.   No.
22     Q.   Would it be possible to obtain such a copy?
23     A.   I don't know if a copy exists.  You say

40

1  copy.  All this is done electronically.  So I don't,
2  I'm not familiar enough with the process to tell you
3  that there is a copy of a document.
4     Q.   This letter was sent to 30 East Butler Ave.
5  in Ambler, Pennsylvania.  Do you have any idea, do
6  you know what 30 East Butler Avenue is?
7     A.   Yes.
8     Q.   And what is your understanding of what is
9  located at 30 East Butler Ave?
10     A.   Your law office.
11     Q.   Which is Kimmel & Silverman?
12     A.   Yes.
13     Q.   And you understand that this is a business
14  address not a residential address?
15     A.   I don't know that, but if you're saying
16  that, I have no reason to not agree with that.
17     Q.   Are you aware that Gary Christy has never
18  lived at this address?
19     A.   I don't know.
20     Q.   Do you have any idea why this address
21  showed up as an address in the Lexis search as a
22  possible address to which, at which to reach the
23  consumer?

41

1   A.   I don't know how it did.  I mean I can give
2   theories, but I don't know exactly how it came to be
3   that that was the address.
4       Q.   What would be something that you would
5   guess or theorize?
6       A.   In the database that LexisNexis utilizes,
7   the Gary Christy name appears, and apparently there
8   is a senior and a junior Gary Christy, and in trying
9   to identify a location for one of those Gary
10  Christies it may have used information for Gary
11  Christy Senior and in some information that either
12  on his credit report or in any other source document
13  that is used by this search, his wife's name might
14  have been associated and she has a business address,
15  I can only speculate.  I don't know the exact
16  process by which they can identify all the
17  information they identify.
18      Q.   Fine.  Thank you.  Would it be all right if
19  we took a five-minute break now?
20      A.   Sure.
21          MR. SCHWARTZ:  Sure.
22          (Recess)
23          MR. GINSBURG:  Back on the record.

42

1           MR. SCHWARTZ:  During the break, this
2   is Andrew Schwartz, during the break I confirmed
3   with Mr. Burns that I didn't think he maybe
4   understood a question completely regarding the
5   public record information.  And so the answer he
6   gave you, he would like the opportunity to clarify
7   his response with respect to those records.
8   Mr. Burns go ahead.
9       A.   The question was about the information from
10  LexisNexis.  And I think you asked something about
11  did you have information showing the address.  I
12  can't remember how it was exactly phrased, but I
13  know I answered that we do not have the information
14  from LexisNexis, but I was referring to the time
15  that we sent the letter out not subsequent to that
16  as part of our research in this particular case.  We
17  did go to LexisNexis to get, to pull a printed copy
18  of information relative to the account which we
19  don't do in the normal course of handling the
20  accounts.  But if we go back on a research basis,
21  our analyst pulled out the information to show and
22  see what the address was that they had provided.  So
23  we did pull that information but it was after the

43

1   time that, it was well after the complaint had been
2   filed and the case had been settled.  So when I was
3   answering your question I was answering it relative
4   to the time frame.  But Andrew pointed out I should
5   mention that we did eventually obtain that
6   information sometime after the fact.
7       Q.   Okay.  Thank you.  Now I am going to go
8   over, I have a few more questions that shouldn't
9   take much longer.  I will jump around a lot, just
10  things that I didn't get in the first hour of the
11  deposition.  So forgive me if I am confusing with
12  the questions as far as the order that they're
13  asked.
14          But going back to the June 14th, 2001
15  letter, you mentioned that some of your letters are
16  drafted by compliance.  They're sent out by third
17  party vendors.  Without disclosing confidential
18  information about this particular debtor, which
19  company or which entity was it that drafted this
20  letter?
21      A.   This is a standard letter that our company
22  uses for, it's called the first letter is what we
23  characterize it as.  The letters are drafted by us,

44

1   reviewed by counsel.  It's again compliance has to
2   sign off.  There is a process to have a letter to be
3   used.
4       Q.   Was there a third party who mailed this
5   letter out, or was it done within EOS CCA?
6       A.   No.  The mail providers send the letters
7   out.  We don't see them.  We don't process them.
8       Q.   Who is this mail processer?
9       A.   Again I don't recall the exact name.  I
10  thought it was Metro, something to be honest with
11  you.  I don't recall the exact name of the provider.
12  I don't get involved in that part of the process.  I
13  used to years ago, but I do not now.  So I'm not
14  familiar with the current vendor.
15      Q.   But it is a third party company that mails
16  out the letters?
17      A.   Yes.
18      Q.   Okay.  Now was this debt, again without
19  going into the confidential nature or information
20  about it, you mentioned that your debts are, the
21  debts owned by EOS CCA they are mostly personal and
22  mostly consumer in nature?
23          MR. SCHWARTZ:  Objection as to form.

45

1  You started that off -- can you reask the question.
2      **Q.**  Yes.  This debt --
3          MR. SCHWARTZ:  Sorry to interrupt are
4  you talking about this particular AT&T Mobility debt
5  or just in general.  That's the question.
6          MR. GINSBURG:  I was going to ask both.
7      **Q.**  The AT&T Mobility debt that EOS CCA
8  collects, are they categorized exclusively as being
9  personal?
10      **A.**  No.
11      **Q.**  So some are personal and some are business?
12      **A.**  Yes.
13      **Q.**  Now this account was this categorized as a
14  personal or business account?
15      **A.**  I believe it would be a personal account.
16      **Q.**  Are you certain of this or you just
17  believe?
18      **A.**  I believe.  I have to verify in our system,
19  but I have no reason to believe it's classified as a
20  commercial account.
21      **Q.**  Are there different letters that are sent
22  out for commercial accounts than there are for
23  personal accounts?

46

1      **A.**  Not for this particular circumstance.
2      **Q.**  This particular circumstance meaning what?
3      **A.**  Meaning this client and this category of
4  business.
5      **Q.**  And what do you mean this category of
6  business?
7      **A.**  There are certain times when they'll
8  identify files to us as being solely commercial and
9  so those might have a separate method of being
10  handled, but in the normal placement of business,
11  they can give us these accounts.  We assume that
12  they're consumer.  We might find out after the fact
13  that it was a real estate broker that uses her cell
14  phone for business purposes and that the majority of
15  the debt was for a business or commercial purpose,
16  but the treatment as far as the letters and the
17  tactics and the strategy are handled as if it were a
18  consumer account.
19      **Q.**  That answers the question.  Now I am going
20  to refer you to the Answer and Affirmative Defenses
21  which EOS filed on October 10th.  Now for
22  affirmative, it is the second affirmative defense.
23  It's on Page 9 I believe.  It reads, "Any violation

47

1  of the FDCPA which EOS CCA denies was not
2  intentional and resulted from a bona fide error
3  notwithstanding the maintenance of procedures
4  reasonably adapted to avoid such errors."  Did I
5  read that correctly?
6      **A.**  I don't have a copy of it in front of me.
7  It wasn't on the information that I was, that I have
8  immediately in front of me.
9      **Q.**  This was the document marked EOS 2.  This
10  was for the answer filed.
11      **A.**  Okay.
12      **Q.**  Only Page 9.
13      **A.**  I was looking at the wrong document.
14      **Q.**  That's fine.
15      **A.**  Okay.  I have page 9.
16      **Q.**  I will read it over again.  "Any violation
17  of the FDCPA which EOS CCA denies was not
18  intentional and resulted from a bona fide error
19  notwithstanding the maintenance of procedures
20  reasonably adapted to avoid such error."  Did I read
21  that correctly?
22      **A.**  Yes.
23      **Q.**  Now what is your understanding of the

48

1  phrase that this resulted from a bona fide error?
2      **A.**  Well my understanding --
3      **Q.**  I know you're not a lawyer.
4      **A.**  Right.  My understanding is that a bona
5  fide error arises when you follow a procedure
6  assuming that you are doing it correctly and it
7  turns out that it was not correct but you had no
8  intention upon, you had no intention upon doing
9  whatever it was that is the subject of the matter.
10          So the error arises when you follow a
11  procedure which you believe is valid and which you
12  understood to be accurate but the result is
13  something that turns out to be erroneous.
14      **Q.**  And after it says bona fide error it says
15  notwithstanding the maintenance of procedures
16  reasonably adapted to avoid such error?
17      **A.**  Right.
18      **Q.**  So it's your position that EOS CCA has
19  procedures in place to avoid such error?
20      **A.**  Yes.
21      **Q.**  And what are those procedures to avoid
22  third party disclosures?
23      **A.**  Again, if it's with respect to mailing the

49

1  letters, we attempt to get good addresses to mail
2  the letters. So we don't send a letter out unless
3  we have a belief that we've got an accurate and full
4  address, and that the letter will get delivered to
5  the intended party.
6      **Q.**  Do you have any written policies pertaining
7  to retaining addresses?
8      **A.**  As far as retaining addresses?
9      **Q.**  Retaining correct addresses?
10     **A.**  I don't know that it's written policy. I
11 mean it's again, we follow the FDCPA. All of our
12 procedures and our processes are designed to be
13 compliant with an FDCPA. So presumably if we're
14 mailing a letter and we've identified an address we
15 have a reason to believe that's a good address. In
16 circumstances where it wasn't the primary address
17 provided by the client the information will be
18 marked as confidential to the consumer so that when
19 it's received if for some reason it's at an address
20 where the consumer is not living but might be
21 associated with, the recipient would pass it along
22 to the appropriate party and not open it and
23 identify or read the information in it.

50

1      **Q.**  But at the same time, I mean do you and
2  other people from EOS CCA know that -- you know that
3  these letters still could be opened if they're sent
4  to the wrong address, correct?
5            MR. SCHWARTZ: Objection. You can
6  answer.
7      **A.**  Somebody can violate federal law and open
8  somebody else's mail. I guess that's always a
9  possibility. In this case a law clerk in your
10 office opened a letter that was addressed not to her
11 or to your firm but to Gary Christy Confidential,
12 apparently disregarded what that said, and opened
13 the letter. So anything is possible I guess.
14     **Q.**  All right. Now, I am going to refer you to
15 the answers and objections to Gary Christy's
16 interrogatories of the discovery responses, and I
17 ask they be marked EOS 3?
18           (Exhibit No. 3 Defendant
19           EOS CCA's Answers and
20           Objections to Plaintiff
21           Gary Christy's
22           Interrogatories was marked
23           for Identification.)

51

1      **Q.**  Mr. Burns are you familiar with these
2  responses?
3      **A.**  I've read them, yes.
4      **Q.**  Were you the person who supplied the
5  information in this report?
6      **A.**  I did not directly supply the information.
7  My staff I think researched this and prepared the
8  information for Mr. Schwartz.
9      **Q.**  So it was your staff that did this. And
10 who is, your staff meaning who?
11     **A.**  Meaning the vice-president of compliance,
12 the compliance manager, our litigation manager, our
13 compliance analyst, any possible person that might
14 have provided some research on this particular case.
15     **Q.**  But you don't know offhand who it was?
16     **A.**  I don't know specifically who did it, no.
17 I reviewed it, but again, I didn't prepare it. I
18 reviewed it to see if I thought it was accurate.
19     **Q.**  And at the time that this was sent out to
20 our office, it was your understanding that the
21 information was accurate?
22     **A.**  Yes.
23     **Q.**  And have you had a chance to read these

52

1  today or recently?
2      **A.**  I didn't read it today or within the past
3  week.
4      **Q.**  But to the best of your understanding, is
5  this information still accurate?
6      **A.**  As far as I know when I read it I thought
7  it was accurate, but again, you know that's, as far
8  as I know it's accurate.
9      **Q.**  Now I am going to refer you to
10 Interrogatory No. 4, Page 6 of EOS 3. It says here,
11 "Identify and describe with particularity all
12 training that defendant provides or receives in the
13 area of debt collection activities including but not
14 limited to the training content, timing and
15 duration; all documents and audio or visual
16 materials used in such training; and each person
17 involved in providing such training." Is my reading
18 correct?
19     **A.**  Yes.
20     **Q.**  And EOS CCA objected to this interrogatory
21 as overly broad unduly burdensome and not reasonably
22 calculated to lead to admissible evidence. And it's
23 intended to harass and oppress EOS CCA.

53

1    Now it's your position that this
2    question is not relevant?
3         MR. SCHWARTZ: You're asking him to
4    draw a legal conclusion. The objections were
5    drafted by counsel. I object as to form. If he can
6    answer he can.
7         A.   No. I agree with what counsel wrote as his
8    answer.
9         Q.   So you think that this -- but you also
10   raised as an affirmative defense that any violation
11   was a result of a bona fide error notwithstanding
12   the maintenance of procedures reasonably adapted?
13        MR. SCHWARTZ: Again objection. I
14   think you're misreading that defense. I'm sorry.
15   You're misreading the defense. Denying any
16   violation but --
17        MR. GINSBURG: I understand.
18        MR. SCHWARTZ: That's all I'm asking,
19   if you read it accurately because you're reading it
20   as if we're conceding it was a bone fide error, when
21   it wasn't.
22        Q.   Any violation of the FDCPA which EOS CCA
23   denies was not intentional and resulted from a bona

54

1    fide error notwithstanding the maintenance of
2    procedures reasonably adapted to avoid such error.
3         MR. SCHWARTZ: Better.
4         Q.   I know that EOS CCA denies all wrongdoing
5    but also says that procedures are in place to avoid
6    any FDCPA violation, correct?
7         A.   That is correct.
8         Q.   But here in the interrogatory EOS objects
9    to a description of training including legal
10   training as overly broad unduly burdensome and not
11   reasonably calculated to admissible evidence. So
12   what I'm getting at is how can you say that this
13   discovery request is not relevant when at the same
14   time saying that procedures are in place to avoid
15   such errors?
16        MR. SCHWARTZ: Again I'll put an
17   objection as to form. He is asking questions about
18   legal conclusions from a non-attorney and there
19   isn't a motion pending with respect to the
20   sufficiency of the response. So I have a number of
21   problems with the question you're asking right now.
22   But if he can answer it. I think he already has
23   answered it, but if he can answer it, please. If

55

1    you can go ahead.
2         A.   Well, again, we want to identify and
3    describe the training content, timing and duration,
4    that I could talk for the next three hours about
5    everything that is involved in training. I think
6    it's, you know, what specific to this particular
7    case. I think our objection to this and our answer
8    to this is accurate. I have nothing further to add.
9         Q.   I think the training has already been
10   described as to the letter writing so I'll back off
11   that question. I understand.
12        Moving on to another subject as being
13   in charge of compliance, regulatory compliance, have
14   there been complaints filed against either formal
15   court complaints or something like the Better
16   Business Bureau about third party disclosures by
17   EOS CCA in the past year?
18        MR. SCHWARTZ: Objection as to form.
19   You can answer if you can.
20        A.   I believe there are. I don't, again,
21   remember the content of each complaint, so
22   whether -- yes, there have been complaints filed
23   with the Better Business Bureau in the past year,

56

1    but whether they were specifically about third-party
2    contact, I honestly wouldn't know that off hand. I
3    would have to research that to give you an answer.
4         Q.   Do you know of any federal or state
5    complaints filed against EOS CCA in the past year
6    for third-party violations, third-party disclosure
7    violations?
8         A.   Again my answer would be, I know that there
9    are complaints that are filed that we addressed, but
10   I don't remember the exact content of each complaint
11   so that I could tell you that there were 7 of this
12   or 8 of that. I don't have that information in
13   front of me. I would assume there was at least 1.
14        Q.   If you don't know you don't know. How do
15   you discipline, I would assume that employing more
16   than a thousand collectors that there are collectors
17   who violate that FDCPA, is that correct?
18        A.   There may be cases where that happens, yes.
19        Q.   And how are collectors who violate the
20   FDCPA disciplined?
21        MR. SCHWARTZ: Sorry. Objection as to
22   form. You can answer if you can.
23        A.   If the person violates it and we feel it's

57

1   a matter of training issue, then the person would be
2   retrained by the manager and trainer, probably a
3   written warning on the first occasion. If it
4   happens more than once then normally the person
5   would either be put on probation or just be fired.
6      **Q.** And does this happen often, like meaning
7   how many collectors would you estimate have been
8   terminated in the past year for FDCPA violations?
9      **A.** I don't know the number.
10     **Q.** Would you say that it's been more than 10?
11     **A.** I don't know the number so I don't want to
12  guess.
13     **Q.** But it has happened in the last year?
14     **A.** I would imagine it does. We have a very
15  tight training program, monitoring program, auditing
16  program, and we have very low tolerance for people
17  that do violate the law.
18     **Q.** I have one more question which goes back to
19  on the June 14th collection letter which was marked
20  as EOS 1. How would you determine or someone at EOS
21  CCA determine that this letter was in fact sent?
22     **A.** How would we determine that the letter was
23  sent? I would --

58

1     **Q.** Yes.
2     **A.** There would be an indication in the
3  collection notes for the consumer's account that a
4  letter was requested and that a letter was sent.
5     **Q.** And requested by who?
6     **A.** Well, just requested by again when new
7  business is placed there is a protocol that is
8  followed so that notices are sent within a certain
9  number of days on the account as part of the
10  process. So it's done, again, automated, not done
11  by an individual collector. It's just done on an
12  automated basis. When a call comes in on a letter
13  the collector answers the call or if a call is being
14  initiated by the collector, then they talk to the
15  consumer, but they're not involved in sending the
16  letters out. That is done on an automated basis.
17     **Q.** How is it determine which letter is sent
18  out? Is that done on an automated basis as well?
19     **A.** Yes. If this is a new placement, new
20  account, then the so-called letter number 1 is the
21  first notice because there is, as you know, required
22  language that has to be provided in that initial
23  notice including the validation clause and the mini

59

1   Miranda notice. Those are by law required to be
2   sent within a certain number of days.
3     **Q.** Just going back now to the discovery
4  responses. I would ask that the responses and
5  objections to Gary Christy's Request for Production
6  of Documents be marked as EOS 4.
7         (Exhibit No. 4 Defendant
8         EOS CCA's Responses and
9         Objections to Plaintiff
10        Gary Christy's Request for
11        Production of Documents was
12        marked for Identification.)
13     **Q.** Mr. Burns, have you seen these responses
14  before?
15     **A.** Yes.
16     **Q.** Did you approve these responses as they
17  were sent out?
18     **A.** I didn't approve them at the time that they
19  were sent out. I reviewed the information but it
20  wasn't, it wasn't me directly that approved the
21  response. That was reviewed by one of the staff
22  people in my department with our attorney.
23     **Q.** Do you know again specifically which staff

60

1   person it was or could have been?
2     **A.** I don't know exactly who it was.
3     **Q.** Have you gotten a chance to look over these
4  today or within the last week?
5     **A.** I looked at them maybe a week ago.
6     **Q.** And when you looked at them, did you notice
7  anything in the responses that you would wish to
8  change?
9     **A.** I don't believe so.
10     **Q.** So everything to the best of your knowledge
11  is accurate?
12     **A.** When I reviewed it I thought it was.
13     **Q.** Thank you. That about wraps up my
14  questions. Mr. Schwartz do you have anything?
15        MR. SCHWARTZ: I actually do.
16     **Cross-Examination**
17     **Q.** (By Mr. Schwartz) Mr. Burns if you could
18  turn to what was marked as EOS 1, the June 14th,
19  2011 letter sent to Gary Christy?
20     **A.** Yes.
21     **Q.** Now, in connection with the bona fide error
22  questions that were asked of you, do you recall
23  those questions?

61

1    **A.**   In general I do.  Not specifically.

2    **Q.**   Okay.  First let me ask you a general

3    question.  Does EOS CCA when they send out a letter

4    is there any intent to send it to a party that is

5    not a debtor?

6    **A.**   No.

7    **Q.**   So the intent of the letter is to get in

8    touch with the debtor who owes the debt obligation,

9    is that accurate?

10   **A.**   Yes.

11   **Q.**   Now you said that the address on the June

12   14th, 2011, letter sent to Gary Christy, that the

13   address 30 East Butler Avenue, Ambler, PA was not

14   the address that was provided by AT&T Mobility, is

15   that accurate?

16   **A.**   Yes.

17   **Q.**   And so as a result of a public record

18   search the address that is on this letter, the

19   address to which the letter was mailed to, is a

20   result of a public records search, is that accurate?

21   **A.**   Well it's a result of the vendor that we

22   use LexisNexis.  However, whatever they search, I

23   don't know their proprietary confidential processes

62

1    as to where they collect their data, but they have

2    numerous databases from which they obtain

3    information.  And if you're seeking an address or

4    phone number they will provide you with information

5    based on your database.  So I don't know.  You say

6    public record search.  I'm not certain what that

7    means.

8    **Q.**   I am sorry.  So your definition.  But are

9    aware of what they used to search, and I don't want

10   you to go through specifics but with respect to Gary

11   Christy are you aware of whether they simply plugged

12   in a name or did they use any other information, if

13   you're aware?

14   **A.**   I'm not certain what they used.  We send

15   the information that is in our file.  So I don't

16   know what they used to determine the information

17   that they capture.

18   **Q.**   Now, you know that maybe that because this

19   is not the address provided by the creditor that

20   there is a possibility that the address you're

21   sending this to might be incorrect.  Do you

22   understand that?

23   **A.**   Yes.

63

1    **Q.**   So just to make sure I understand.  So your

2    procedure with respect to this letter, what do you

3    do to make sure that somebody else doesn't open the

4    letter improperly?

5    **A.**   Once a new address is used which was not

6    the address provided by the creditor, the letter is

7    addressed, so it's marked confidential so that when

8    it's received at the address it would presumably be

9    passed on to the person who is the subject of the

10   account.

11   **Q.**   Just quickly, obviously in the complaint

12   the plaintiff, again if you don't understand, you

13   don't recognize the statute let me know, but in the

14   complaint the plaintiff alleges violation of the

15   FDCPA.  Are you aware of that?

16   **A.**   Yes.

17   **Q.**   And in particular they allege a violation

18   of 1692 C and in (B) of the FDCPA by communicating

19   with third parties in connection with the collection

20   of the debt.  Sir, are you aware of any

21   communications by EOS CCA to a third party?

22   **A.**   No.

23   **Q.**   With respect to Gary Christy?

64

1    **A.**   No.

2    **Q.**   In your mind, just asking for your opinion,

3    as an officer, as a person who does compliance, if a

4    third party such as Kimmel & Silverman open this

5    letter despite the fact it's not addressed to them,

6    can that amount to an unauthorized third-party

7    disclosure by EOS CCA?

8    **A.**   I don't believe so.

9    **Q.**   I believe you were asked earlier about

10   Better Business Bureau complaints, AG complaints and

11   legal complaints.  Do you recall that?

12   **A.**   Yes.

13   **Q.**   I am going to ask you this:  Are you aware

14   of any Better Business Bureau complaint, AG

15   complaint, or legal complaint where the consumer

16   complained that a third party, complained of a

17   third-party disclosure because another third party

18   opened a letter addressed to the consumer?

19   **A.**   Yes.

20   **Q.**   And do you recall that case in particular?

21   **A.**   Yes.  The case you're referring to is the

22   Watts case, W A T T S.

23   **Q.**   And was that a Better Business Bureau

65

1  complaint or what kind of claim?

2     A.   It was a lawsuit that was filed.

3     Q.   Do you know whatever happened with that

4  lawsuit?

5     A.   Yes. The case was dismissed. We made a

6  motion for dismissal and we were granted the

7  dismissal of the case. It was deemed not to have

8  violated the FDCPA.

9     Q.   Let me make sure I understand, that was a

10  situation where EOS sent a letter marked

11  confidential based on public record, based on a

12  record search, is that correct?

13     A.   That's correct.

14     Q.   And they sent it to I believe it was the

15  stepson of the debtor, correct?

16     A.   Yes.

17     Q.   And it was addressed to the name of the

18  debtor, is that correct?

19     A.   Yes.

20     Q.   And the stepson improperly opened the

21  letter that wasn't addressed to him, is that

22  correct?

23     A.   Yes.

66

1     Q.   And the court found that wasn't a violation

2  of the FDCPA?

3     A.   Yes. Their claim was it was a third-party

4  disclosure but the court ruled otherwise.

5     Q.   I don't have any further questions. Thank

6  you.

7     A.   Okay.

8         MR. SCHWARTZ: Are we done?

9         MR. GINSBURG: Yes. I have no further

10  questions.

11         (The proceedings adjourned

12         at 3:24 p.m.)

13

14

15

16

17

18

19

20

21

22

23

67

1         <u>WITNESS CERTIFICATE</u>

2

3

4

5       I, JOHN F. BURNS, JR., do hereby certify

6  that I have read the foregoing transcript of my

7  testimony and further certify that said transcript

8  is a true and accurate record of said testimony.

9

10

11  SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

12  THIS _____ DAY OF _____,2012.

13

14

15

16

17

18

19

20

21

22

23

68

1         C E R T I F I C A T E

2

  STATE OF MASSACHUSETTS  )

3                )

  COUNTY OF NORFOLK     )

4

     I, *CAROL DiFAZIO*, a Notary Public in and

5  for the County of Norfolk, State of MASSACHUSETTS,

  do hereby certify:

6

     That the witness in the foregoing

7  deposition was present at the time and place therein

  stated;

8

     That the said proceeding was taken before

9  me as a Notary Public at the said time and place and

  was taken down in machine shorthand writing by me;

10

     That I am a Registered Professional

11  Reporter of the State of Massachusetts, that the

  said proceeding was thereafter under my direction

12  transcribed into computer-assisted transcription,

  and that the foregoing transcript constitutes a

13  full, true, and correct report of the proceedings

  which then and there took place;

14

     IN WITNESS WHEREOF, I have hereunto

15  subscribed my hand and affixed my seal this

  4th day of April, 2012.

16

17      _____

     CAROL DiFAZIO

18      Registered Professional Reporter

19  My Commission expires November 14, 2014.

20    <u>THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT</u>

  <u>DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY</u>

21  <u>ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR</u>

  <u>DIRECTION OF THE CERTIFYING REPORTER.</u>

22

23

69



1       **WITNESS READING AND SIGNING INSTRUCTIONS**

2

3

4

5              The transcript of JOHN F. BURNS, JR,
         taken on March 15, 2011, has been prepared.  The
6       signature page and errata sheet has been sent to
         Attorney Andrew Schwartz.
7
         When reading and signing has been completed, the
8       signature page and errata sheet should be forwarded
         to all counsel.
9

10

         EXHIBITS WERE ATTACHED TO THE ORIGINAL TRANSCRIPT
11      SENT TO ATTORNEY GINSBURG.

12

13
14
15
16
17
18
19
20
21
22
23

# #

**#108293** [1] - 1:13

# 1

**1** [11] - 2:7, 18:20, 20:7, 29:21, 29:22, 30:8, 32:23, 56:13, 57:20, 58:20, 60:18
**10** [4] - 9:13, 11:20, 19:16, 57:10
**1080** [1] - 11:17
**10th** [2] - 36:1, 46:21
**12** [2] - 4:5, 4:6
**125** [1] - 12:21
**14** [2] - 38:14, 68:19
**14th** [6] - 29:17, 36:11, 43:14, 57:19, 60:18, 61:12
**15** [2] - 1:15, 69:5
**1692** [2] - 30:19, 63:18
**17** [3] - 8:21, 14:2, 14:6
**17th** [1] - 1:21
**1845** [1] - 1:21
**19** [1] - 36:9
**19002** [1] - 1:19
**19103** [1] - 1:21
**1968** [1] - 13:9
**1:30** [1] - 1:15

# 2

**2** [4] - 2:7, 36:1, 36:4, 47:9
**20** [4] - 9:13, 9:14, 10:7, 14:2
**2001** [1] - 43:14
**2011** [7] - 29:18, 36:1, 36:12, 38:14, 60:19, 61:12, 69:5
**2012** [3] - 1:15, 67:12, 68:15
**2014** [1] - 68:19
**29** [1] - 2:7
**2:11** [1] - 1:5

# 3

**3** [7] - 2:2, 2:8, 4:20, 19:10, 50:17, 50:18, 52:10
**30** [6] - 1:18, 33:2, 40:4, 40:6, 40:9, 61:13
**36** [1] - 2:7

**3:24** [1] - 66:12

# 4

**4** [4] - 2:10, 52:10, 59:6, 59:7
**4th** [1] - 68:15

# 5

**5** [3] - 16:4, 26:11, 36:9
**50** [3] - 2:8, 12:23, 13:12
**59** [1] - 2:10

# 6

**6** [1] - 52:10
**6.8** [1] - 26:8
**60** [1] - 2:2

# 7

**7** [2] - 26:8, 56:11
**700** [2] - 1:14, 8:15

# 8

**8** [1] - 56:12

# 9

**9** [3] - 46:23, 47:12, 47:15
**95** [1] - 16:5

# A

**ability** [2] - 5:12, 32:14
**access** [1] - 12:12
**account** [36] - 20:6, 21:23, 22:17, 22:19, 23:9, 26:19, 29:3, 29:14, 29:15, 30:6, 31:8, 31:15, 31:22, 31:23, 32:2, 32:8, 32:9, 33:6, 33:13, 34:3, 34:9, 35:15, 37:16, 37:18, 39:13, 39:18, 42:18, 45:13, 45:14, 45:15, 45:20, 46:18, 58:3, 58:9, 58:20, 63:10
**account's** [1] - 27:4

**accounts** [21] - 21:8, 22:15, 23:21, 24:11, 24:17, 25:14, 25:23, 26:3, 26:8, 27:22, 28:1, 30:15, 30:22, 31:3, 32:7, 34:17, 42:20, 45:22, 45:23, 46:11
**accuracy** [2] - 23:22, 24:1
**accurate** [17] - 21:17, 23:12, 27:18, 29:3, 48:12, 49:3, 51:18, 51:21, 52:5, 52:7, 52:8, 55:8, 60:11, 61:9, 61:15, 61:20, 67:8
**accurately** [3] - 5:13, 6:4, 53:19
**achieve** [2] - 19:22, 20:1
**Action** [1] - 1:5
**active** [1] - 26:3
**activities** [2] - 14:23, 52:13
**activity** [2] - 16:3, 31:9
**adapted** [5] - 47:4, 47:20, 48:16, 53:12, 54:2
**add** [1] - 55:8
**additional** [1] - 9:1
**address** [81] - 8:14, 21:6, 21:13, 22:4, 22:6, 22:8, 22:14, 22:16, 22:18, 22:21, 23:8, 23:9, 23:10, 24:2, 24:5, 24:7, 24:23, 25:6, 25:7, 25:10, 27:5, 27:8, 27:10, 31:17, 31:19, 33:6, 33:7, 33:8, 33:9, 33:10, 33:12, 33:14, 33:15, 33:16, 34:11, 34:12, 34:15, 35:4, 35:5, 35:6, 35:11, 36:13, 36:17, 37:12, 37:14, 37:17, 37:23, 38:3, 38:16, 38:19, 38:20, 39:8, 39:14, 40:14, 40:18, 40:20, 40:21, 40:22, 41:3, 41:14, 42:11, 42:22, 49:4, 49:14, 49:15, 49:16, 49:19, 50:4, 61:11, 61:13, 61:14, 61:18, 61:19, 62:3, 62:19, 62:20, 63:5, 63:6, 63:8
**addressed** [11] - 33:1,

36:12, 37:12, 38:15, 50:10, 56:9, 63:7, 64:5, 64:18, 65:17, 65:21
**addresses** [7] - 21:7, 27:18, 35:3, 49:1, 49:7, 49:8, 49:9
**adjourned** [1] - 66:11
**admissible** [2] - 52:22, 54:11
**admits** [1] - 36:10
**affiliated** [1] - 14:11
**affixed** [1] - 68:15
**AG** [2] - 64:10, 64:14
**ago** [3] - 7:10, 44:13, 60:5
**agree** [2] - 40:16, 53:7
**agreements** [1] - 15:8
**ahead** [2] - 42:8, 55:1
**alcohol** [1] - 5:11
**allege** [1] - 63:17
**alleges** [1] - 63:14
**allowed** [1] - 12:13
**almost** [1] - 28:17
**ALSO** [1] - 1:23
**alterego** [1] - 11:12
**Ambler** [4] - 1:19, 33:2, 40:5, 61:13
**America** [1] - 11:1
**American** [1] - 12:16
**amount** [1] - 64:6
**analyst** [2] - 42:21, 51:13
**AND** [2] - 67:11, 69:1
**AND/OR** [1] - 68:21
**Andrew** [4] - 8:1, 42:2, 43:4, 69:6
**ANDREW** [1] - 1:20
**annual** [1] - 26:7
**answer** [24] - 5:20, 9:17, 10:2, 10:3, 18:16, 30:19, 32:14, 35:22, 35:23, 36:2, 37:11, 42:5, 47:10, 50:6, 53:6, 53:8, 54:22, 54:23, 55:7, 55:19, 56:3, 56:8, 56:22
**Answer** [4] - 2:7, 36:4, 36:10, 46:20
**answered** [2] - 42:13, 54:23
**answering** [3] - 23:2, 43:3
**answers** [6] - 5:8, 7:2, 7:5, 46:19, 50:15, 58:13
**Answers** [2] - 2:8, 50:19
**anthropology** [1] -

13:17
**ANY** [2] - 68:20, 68:21
**APPEARANCES** [1] - 1:18
**APPLY** [1] - 68:20
**appropriate** [1] - 49:22
**approval** [1] - 20:18
**approve** [3] - 20:23, 59:16, 59:18
**approved** [3] - 19:11, 20:20, 59:20
**approves** [1] - 15:5
**approximate** [5] - 4:6, 4:7, 9:13, 16:1, 25:23
**April** [1] - 68:15
**area** [1] - 52:13
**areas** [1] - 14:16
**argument** [1] - 37:6
**arises** [2] - 48:5, 48:10
**arrangements** [1] - 27:1
**arrive** [1] - 37:22
**aspect** [1] - 23:3
**aspects** [1] - 17:22
**assert** [1] - 30:18
**assigned** [2] - 20:6, 32:22
**assisted** [1] - 68:12
**associate** [2] - 35:4, 35:14
**associated** [7] - 14:1, 22:17, 23:8, 23:14, 33:12, 41:14, 49:21
**assume** [5] - 28:11, 29:3, 46:11, 56:13, 56:15
**assumedly** [1] - 15:2
**assuming** [3] - 34:18, 34:20, 48:6
**assure** [3] - 27:7, 27:21, 28:21
**AT&T** [16] - 30:3, 30:15, 30:22, 31:2, 32:4, 36:13, 37:13, 37:15, 37:20, 38:8, 38:16, 38:19, 39:15, 45:4, 45:7, 61:14
**attached** [1] - 36:22
**ATTACHED** [1] - 69:10
**attempt** [1] - 49:1
**attempts** [1] - 25:20
**attended** [1] - 13:11
**Attorney** [3] - 6:23, 8:1, 69:6
**ATTORNEY** [1] - 69:11
**attorney** [3] - 7:8, 54:18, 59:22

**attorney/client** [1] - 5:23
**audio** [1] - 52:15
**auditing** [1] - 57:15
**audits** [1] - 18:19
**automated** [11] - 23:1, 23:5, 23:6, 23:15, 34:7, 38:1, 39:7, 58:10, 58:12, 58:16, 58:18
**automatically** [2] - 21:20, 39:3
**available** [2] - 23:11, 27:11
**Ave** [3] - 33:2, 40:4, 40:9
**Avenue** [2] - 40:6, 61:13
**avoid** [9] - 17:20, 47:4, 47:20, 48:16, 48:19, 48:21, 54:2, 54:5, 54:14
**aware** [7] - 40:17, 62:9, 62:11, 62:13, 63:15, 63:20, 64:13

**B**

**Babson** [1] - 13:11
**background** [2] - 8:10, 13:2
**backtrack** [3] - 6:7, 15:15, 27:3
**based** [14] - 14:14, 14:16, 19:19, 20:22, 26:14, 27:14, 37:8, 37:12, 37:19, 38:3, 39:8, 62:5, 65:11
**basic** [1] - 18:8
**basis** [11] - 9:18, 9:20, 26:7, 26:19, 34:8, 37:13, 39:7, 42:20, 58:12, 58:16, 58:18
**batches** [1] - 34:10
**bearing** [1] - 39:2
**became** [1] - 11:4
**become** [1] - 30:11
**beginning** [1] - 14:3
**behalf** [7] - 1:13, 1:19, 1:22, 5:2, 15:18, 16:5, 26:20
**belief** [1] - 49:3
**best** [3] - 32:14, 52:4, 60:10
**better** [1] - 54:3
**Better** [5] - 55:15, 55:23, 64:10, 64:14, 64:23
**big** [1] - 17:12

**bill** [1] - 32:20
**billion** [1] - 26:9
**bit** [1] - 27:4
**blindly** [1] - 27:13
**board** [1] - 14:12
**bona** [8] - 47:2, 47:18, 48:1, 48:4, 48:14, 53:11, 53:23, 60:21
**bone** [1] - 53:20
**bonus** [1] - 20:1
**Bradstreet** [1] - 13:21
**break** [5] - 5:18, 5:19, 41:19, 42:1, 42:2
**breakdown** [1] - 16:1
**briefly** [1] - 14:18
**bring** [2] - 6:15, 6:20
**broad** [2] - 52:21, 54:10
**broker** [1] - 46:13
**bulk** [1] - 34:1
**burdensome** [2] - 52:21, 54:10
**Bureau** [5] - 55:16, 55:23, 64:10, 64:14, 64:23
**Burns** [4] - 2:2, 3:19, 8:11, 8:13
**burns** [13] - 3:18, 3:20, 4:2, 5:10, 8:10, 13:4, 13:18, 35:16, 42:3, 42:8, 51:1, 59:13, 60:17
**BURNS** [4] - 1:12, 3:10, 67:5, 69:5
**business** [20] - 8:14, 11:2, 11:9, 11:14, 14:17, 16:10, 16:12, 16:18, 17:23, 19:17, 40:13, 41:14, 45:11, 45:14, 46:4, 46:6, 46:10, 46:14, 46:15, 58:7
**Business** [5] - 55:16, 55:23, 64:10, 64:14, 64:23
**Butler** [6] - 1:19, 33:2, 40:4, 40:6, 40:9, 61:13
**BY** [1] - 68:20

**C**

**calculated** [2] - 52:22, 54:11
**Canada** [3] - 11:21, 12:15, 12:20
**capture** [2] - 28:16, 62:17
**Carol** [1] - 1:13

**CAROL** [2] - 68:4, 68:17
**case** [18] - 7:11, 10:2, 17:15, 29:14, 30:9, 32:4, 34:18, 34:20, 42:16, 43:2, 50:9, 51:14, 55:7, 64:20, 64:21, 64:22, 65:5, 65:7
**cases** [5] - 4:22, 26:16, 32:4, 32:19, 56:18
**categorized** [3] - 16:14, 45:8, 45:13
**category** [3] - 19:16, 46:3, 46:5
**CCA** [70] - 1:9, 1:14, 1:23, 3:21, 5:2, 6:12, 6:13, 9:6, 9:11, 10:8, 10:13, 10:21, 10:23, 11:4, 11:6, 11:9, 11:14, 11:16, 11:18, 12:17, 12:20, 14:1, 15:14, 15:15, 16:2, 16:8, 16:21, 19:4, 21:3, 21:12, 22:1, 22:13, 22:20, 25:11, 25:13, 25:17, 26:1, 26:11, 26:14, 27:21, 28:12, 29:21, 30:6, 30:15, 30:23, 31:2, 31:10, 33:6, 34:3, 34:6, 36:10, 44:5, 44:21, 45:7, 47:1, 47:17, 48:18, 50:2, 52:20, 52:23, 53:22, 54:4, 55:17, 56:5, 57:21, 61:3, 63:21, 64:7
**CCA's** [5] - 2:8, 2:10, 7:1, 50:19, 59:8
**cell** [1] - 46:13
**certain** [11] - 19:22, 20:1, 32:9, 34:14, 34:19, 45:16, 46:7, 58:8, 59:2, 62:6, 62:14
**CERTIFICATE** [1] - 67:1
**CERTIFICATION** [1] - 68:20
**certify** [3] - 67:5, 67:7, 68:5
**CERTIFYING** [1] - 68:21
**cetera** [2] - 19:7, 28:23
**chance** [2] - 51:23, 60:3
**change** [4] - 25:6, 25:11, 39:6, 60:8

**changes** [2] - 21:12, 22:7
**characteristics** [1] - 31:6
**characterize** [1] - 43:23
**charge** [1] - 55:13
**Christies** [1] - 41:10
**Christy** [16] - 3:16, 29:15, 30:17, 33:1, 35:23, 36:13, 38:16, 40:17, 41:7, 41:8, 41:11, 50:11, 60:19, 61:12, 62:11, 63:23
**CHRISTY** [1] - 1:7
**Christy's** [8] - 2:9, 2:10, 6:13, 39:18, 50:15, 50:21, 59:5, 59:10
**circumstance** [2] - 46:1, 46:2
**circumstances** [2] - 28:19, 49:16
**City** [1] - 13:7
**Civil** [1] - 1:5
**claim** [3] - 6:13, 65:1, 66:3
**clarify** [1] - 42:6
**classified** [1] - 45:19
**classroom** [3] - 18:23, 19:10, 19:14
**clause** [1] - 58:23
**clear** [1] - 5:15
**clerk** [1] - 50:9
**client** [14] - 20:23, 21:9, 26:20, 26:21, 27:15, 29:15, 30:3, 30:18, 30:23, 31:12, 31:13, 38:4, 46:3, 49:17
**clients** [6] - 15:8, 21:2, 26:15, 27:2, 28:16, 29:10
**Coleman** [1] - 1:21
**collect** [7] - 15:18, 15:21, 16:22, 19:19, 25:19, 25:20, 62:1
**collecting** [1] - 26:10
**collection** [12] - 12:9, 13:19, 13:22, 19:22, 31:9, 32:22, 36:12, 38:15, 52:13, 57:19, 58:3, 63:19
**Collection** [3] - 2:7, 11:1, 29:23
**collections** [1] - 14:15
**Collecto** [3] - 11:8, 11:13, 11:14
**collecto** [1] - 11:11
**collector** [9] - 19:5,

**bill** column continues... [71]
19:13, 20:12, 21:22, 28:6, 58:11, 58:13, 58:14
**collectors** [15] - 12:4, 12:10, 16:17, 18:14, 18:17, 19:8, 19:18, 19:20, 20:3, 22:7, 23:1, 56:16, 56:19, 57:7
**collects** [5] - 15:15, 16:8, 21:3, 25:17, 45:8
**College** [2] - 13:6, 13:11
**college** [2] - 13:3, 13:21
**Columbia** [2] - 13:6, 13:16
**combination** [3] - 11:3, 18:22, 18:23
**commencing** [1] - 1:15
**commercial** [4] - 45:20, 45:22, 46:8, 46:15
**commission** [2] - 19:18, 26:14
**Commission** [1] - 68:19
**commissions** [1] - 19:21
**Commonwealth** [2] - 1:14, 3:12
**communicating** [1] - 63:18
**communication** [2] - 7:19, 18:9
**communications** [3] - 17:11, 63:21
**companies** [1] - 27:17
**company** [29] - 10:14, 10:23, 11:3, 11:5, 11:6, 11:7, 11:11, 13:21, 14:4, 14:11, 14:13, 14:23, 15:9, 15:16, 16:4, 18:22, 24:15, 24:18, 24:23, 25:2, 25:4, 26:7, 33:22, 33:23, 34:1, 34:2, 43:19, 43:21, 44:15
**Company** [1] - 11:1
**complained** [2] - 64:16
**complaint** [12] - 7:6, 35:22, 37:6, 43:1, 55:21, 56:10, 63:11, 63:14, 64:14, 64:15, 65:1
**Complaint** [2] - 2:7,

72

36:5
complaints [8] -
55:14, 55:15, 55:22,
56:5, 56:9, 64:10,
64:11
complete [1] - 6:5
completed [2] - 13:12,
69:7
completely [1] - 42:4
Compliance [1] - 1:23
compliance [18] -
14:20, 15:1, 15:2,
15:4, 15:5, 15:7,
20:17, 20:20, 20:21,
20:23, 43:16, 44:1,
51:11, 51:12, 51:13,
55:13, 64:3
compliant [1] - 49:13
computer [1] - 68:12
computer-assisted
[1] - 68:12
computerized [1] -
23:16
computers [1] - 23:17
conceding [1] - 53:20
concern [1] - 30:19
conclusion [1] - 53:4
conclusions [1] -
54:18
conducted [1] - 3:5
Confidential [1] -
50:11
confidential [9] - 9:22,
10:6, 33:4, 43:17,
44:19, 49:18, 61:23,
63:7, 65:11
confirmed [1] - 42:2
confusing [1] - 43:11
connection [2] -
60:21, 63:19
consider [1] - 32:18
constitutes [1] - 68:12
consumer [25] - 16:9,
16:11, 16:18, 18:2,
18:7, 18:8, 20:8,
20:9, 23:13, 27:22,
27:23, 28:4, 28:7,
29:2, 31:16, 38:5,
40:23, 44:22, 46:12,
46:18, 49:18, 49:20,
58:15, 64:15, 64:18
consumer's [4] - 20:6,
22:14, 33:5, 58:3
consumers [8] -
19:19, 21:6, 22:2,
22:8, 25:1, 27:18,
27:20, 28:13
contact [2] - 28:4,
56:2
contacting [2] - 16:22,

32:2
content [4] - 52:14,
55:3, 55:21, 56:10
contents [1] - 37:5
contracts [2] - 15:7,
15:9
contradicts [1] - 36:16
CONTROL [1] - 68:21
conversation [1] -
28:5
copies [3] - 6:22, 7:7,
7:12
copy [12] - 6:23, 7:3,
8:4, 36:21, 37:3,
39:17, 39:22, 39:23,
40:1, 40:3, 42:17,
47:6
corporate [4] - 3:22,
6:12, 8:19, 11:8
corporation [2] -
10:19, 11:13
correct [35] - 5:3, 5:4,
8:12, 10:17, 13:15,
15:12, 15:13, 15:16,
15:23, 16:7, 22:21,
25:12, 25:15, 26:12,
28:11, 28:22, 30:4,
32:5, 32:6, 37:7,
39:15, 39:16, 48:7,
49:9, 50:4, 52:18,
54:6, 54:7, 56:17,
65:12, 65:13, 65:15,
65:18, 65:22, 68:13
corrected [1] - 39:12
correctly [5] - 29:6,
36:14, 47:5, 47:21,
48:6
correspondence [2] -
7:7, 18:7
cost [2] - 35:11, 39:2
counsel [5] - 37:7,
44:1, 53:5, 53:7,
69:8
COUNTY [1] - 68:3
County [1] - 68:5
couple [1] - 19:13
course [1] - 42:19
COURT [1] - 1:3
court [4] - 6:3, 55:15,
66:1, 66:4
create [1] - 20:22
created [2] - 20:5,
20:19
credit [2] - 13:22,
41:12
creditor [4] - 29:2,
32:5, 62:19, 63:6
creditors [3] - 15:19,
16:6, 21:3
Cross [2] - 2:2, 60:16

cross [1] - 39:6
Cross-Examination
[1] - 60:16
CSR [1] - 1:13
current [10] - 8:14,
9:4, 14:18, 14:20,
16:3, 21:16, 23:12,
24:14, 29:14, 44:14
cv-05045-ER [1] - 1:5

## D

data [2] - 38:1, 62:1
database [8] - 21:20,
23:7, 23:15, 25:5,
25:8, 35:21, 41:6,
62:5
databases [3] - 23:11,
24:13, 62:2
date [2] - 31:23, 32:1
DAY [1] - 67:12
days [5] - 19:10,
19:13, 19:16, 58:9,
59:2
debt [19] - 12:10,
14:22, 15:11, 15:14,
16:3, 18:6, 18:8,
19:4, 25:14, 26:9,
28:5, 44:18, 45:2,
45:4, 45:7, 46:15,
52:13, 61:8, 63:20
debtor [10] - 17:7,
30:9, 30:11, 30:17,
33:5, 43:18, 61:5,
61:8, 65:15, 65:18
debts [19] - 15:15,
15:21, 16:2, 16:8,
16:9, 16:10, 16:12,
16:18, 16:22, 25:17,
25:20, 26:11, 44:20,
44:21
deem [2] - 32:15,
32:16
deemed [2] - 19:11,
65:7
default [5] - 32:7,
32:13, 32:16, 32:17,
32:19
defendant [1] - 52:12
Defendant [8] - 1:10,
1:22, 2:8, 2:8, 2:10,
36:7, 50:18, 59:7
defendant's [1] - 7:1
defense [4] - 46:22,
53:10, 53:14, 53:15
Defenses [3] - 2:8,
36:6, 46:20
defenses [1] - 7:6
define [1] - 37:4

definition [1] - 62:8
degree [1] - 13:16
delivered [4] - 35:7,
35:12, 35:13, 49:4
denies [4] - 47:1,
47:17, 53:23, 54:4
Dennehey [1] - 1:20
denying [1] - 53:15
department [2] -
20:17, 59:22
deponent [1] - 3:17
deposed [4] - 4:1, 4:8,
4:12, 4:23
DEPOSITION [1] -
1:12
deposition [8] - 3:4,
5:22, 6:11, 6:16,
6:23, 8:7, 43:11,
68:7
depositions [5] - 4:13,
4:15, 4:17, 4:21, 5:6
describe [6] - 13:2,
14:9, 14:18, 23:6,
52:11, 55:3
described [1] - 55:10
description [4] - 7:21,
18:3, 30:14, 54:9
Description [1] - 2:5
designed [1] - 49:12
despite [1] - 64:5
detail [2] - 7:21, 14:9
determine [6] - 23:8,
57:20, 57:21, 57:22,
58:17, 62:16
determined [1] - 37:22
determines [2] -
34:22, 34:23
DiFazio [3] - 1:13,
68:4, 68:17
difference [1] - 17:12
different [5] - 24:20,
26:23, 32:13, 38:10,
45:21
digits [3] - 28:8,
28:14, 28:18
DIRECT [1] - 68:21
Direct [2] - 2:2, 3:14
directed [1] - 18:7
direction [1] - 68:11
DIRECTION [1] -
68:21
directly [2] - 51:6,
59:20
director [4] - 9:6, 14:3,
14:12, 14:14
directors [2] - 12:7,
14:12
discipline [1] - 56:15
disciplined [1] - 56:20
disclose [1] - 10:1

disclosing [2] - 30:10,
43:17
disclosure [4] - 56:6,
64:7, 64:17, 66:4
disclosures [2] -
48:22, 55:16
discovery [3] - 50:16,
54:13, 59:3
discussions [1] - 5:21
disingenuous [1] -
37:2
dismissal [2] - 65:6,
65:7
dismissed [1] - 65:5
disregarded [1] -
50:12
DISTRICT [2] - 1:2, 1:3
document [4] - 40:3,
41:12, 47:9, 47:13
documents [7] - 6:15,
6:20, 7:5, 7:12, 8:6,
34:15, 52:15
Documents [2] - 2:11,
59:6, 59:11
DOES [1] - 68:20
dollars [2] - 19:23,
26:9
done [28] - 8:2, 17:20,
17:22, 18:4, 18:11,
18:13, 21:19, 23:1,
23:5, 24:21, 25:2,
28:1, 33:18, 33:20,
34:7, 39:7, 39:18,
40:1, 44:5, 58:10,
58:11, 58:16, 58:18,
66:8
door [3] - 38:9, 38:12,
39:10
down [3] - 29:6, 29:10,
68:9
draft [1] - 20:3
drafted [7] - 20:3,
20:4, 20:14, 43:16,
43:19, 43:23, 53:5
drafts [1] - 20:15
draw [1] - 53:4
Drive [2] - 1:15, 8:15
drug [1] - 5:11
due [1] - 32:17
duly [1] - 3:11
Dun [1] - 13:21
duration [2] - 52:15,
55:3
during [3] - 5:22, 42:1,
42:2
duties [1] - 14:19
duty [1] - 14:20

## E

E0S [1] - 57:20
earn [2] - 19:21, 19:23
East [6] - 1:19, 33:2, 40:4, 40:6, 40:9, 61:13
EASTERN [1] - 1:3
education [2] - 13:3, 13:10
educational [1] - 13:2
effect [1] - 6:1
either [5] - 24:3, 35:8, 41:11, 55:14, 57:5
electronic [4] - 20:10, 21:9, 23:19, 31:4
electronically [1] - 40:1
email [5] - 6:23, 7:14, 7:16, 7:23, 8:5
employ [1] - 11:18
employee [4] - 14:3, 14:13, 18:22, 25:11
employees [6] - 11:16, 12:10, 12:19, 22:13, 22:20, 22:22
employing [1] - 56:15
end [3] - 30:22, 38:9, 39:10
ensure [1] - 18:4
entail [1] - 15:4
enter [1] - 34:6
entire [2] - 28:12, 28:15
entity [2] - 11:9, 43:19
EOS [89] - 1:9, 1:14, 1:23, 2:8, 2:10, 3:21, 5:2, 6:12, 6:13, 7:1, 9:6, 9:10, 10:8, 10:13, 10:21, 10:22, 11:3, 11:4, 11:5, 11:6, 11:7, 11:9, 11:14, 11:16, 11:18, 12:17, 12:20, 14:1, 15:14, 15:15, 16:2, 16:8, 16:21, 19:4, 21:3, 21:12, 22:1, 22:13, 22:20, 25:11, 25:13, 25:17, 25:23, 26:11, 26:14, 27:21, 28:12, 29:20, 30:6, 30:15, 30:23, 31:2, 31:10, 32:23, 33:6, 34:3, 34:5, 34:12, 36:1, 36:2, 36:10, 44:5, 44:21, 45:7, 46:21, 47:1, 47:9, 47:17, 48:18, 50:2, 50:17, 50:19, 52:10,
52:20, 52:23, 53:22, 54:4, 54:8, 55:17, 56:5, 57:20, 59:6, 59:8, 60:18, 61:3, 63:21, 64:7, 65:10
errata [2] - 69:6, 69:8
erroneous [1] - 48:13
error [14] - 47:2, 47:18, 47:20, 48:1, 48:5, 48:10, 48:14, 48:16, 48:19, 53:11, 53:20, 54:1, 54:2, 60:21
errors [2] - 47:4, 54:15
ESQ [2] - 1:18, 1:20
estate [1] - 46:13
estimate [2] - 5:16, 57:7
et [2] - 19:7, 28:23
events [1] - 5:12
eventually [1] - 43:5
evidence [2] - 52:22, 54:11
Ex [1] - 2:5
exact [2] - 4:19, 9:12, 25:3, 41:15, 44:9, 44:11, 56:10
exactly [4] - 17:2, 41:2, 42:12, 60:2
Examination [2] - 3:14, 60:16
examined [1] - 3:13
exclusively [2] - 16:9, 45:8
excuse [1] - 17:18
exhibit [1] - 36:22
Exhibit [4] - 29:22, 36:4, 50:18, 59:7
EXHIBITS [1] - 69:10
exist [1] - 35:5
existing [2] - 11:4, 19:12
exists [1] - 39:23
expense [1] - 35:10
experience [3] - 14:15, 14:16, 19:15
experienced [1] - 19:13
expires [1] - 68:19

## F

facilities [1] - 14:22
fact [6] - 29:8, 37:8, 43:6, 46:12, 57:21, 64:5
fair [1] - 30:21
familiar [6] - 5:5, 29:15, 29:17, 40:2,
44:14, 51:1
far [7] - 23:3, 30:10, 43:12, 46:16, 49:8, 52:6, 52:7
FCRA [1] - 15:2
FDCPA [20] - 4:8, 4:12, 4:14, 15:2, 16:21, 29:14, 30:12, 47:1, 47:17, 49:11, 49:13, 53:22, 54:6, 56:17, 56:20, 57:8, 63:15, 63:18, 65:8, 66:2
federal [2] - 50:7, 56:4
few [1] - 43:1
fide [9] - 47:2, 47:18, 48:1, 48:5, 48:14, 53:11, 53:20, 54:1, 60:21
fields [3] - 21:10, 31:18, 31:20
file [7] - 21:9, 21:16, 25:5, 31:5, 35:8, 35:18, 62:15
filed [11] - 35:22, 35:23, 36:2, 43:2, 46:21, 47:10, 55:14, 55:22, 56:5, 56:9, 65:2
files [6] - 21:15, 21:18, 23:18, 27:20, 28:1, 46:8
financial [1] - 9:4
fine [7] - 3:9, 5:17, 7:21, 10:4, 30:16, 41:18, 47:14
finish [1] - 35:16
fired [1] - 57:5
firm [2] - 7:8, 50:11
first [8] - 14:8, 14:10, 17:5, 43:10, 43:22, 57:3, 58:21, 61:2
five [2] - 11:21, 41:19
five-minute [1] - 41:19
floor [2] - 1:21, 19:12
folder [1] - 7:10
follow [5] - 15:10, 24:16, 48:5, 48:10, 49:11
followed [1] - 58:8
follows [1] - 3:13
FOR [1] - 1:3
foregoing [3] - 67:6, 68:6, 68:12
FOREGOING [1] - 68:20
forgive [1] - 43:11
form [14] - 3:7, 17:4, 18:15, 22:5, 22:10, 25:15, 26:2, 26:4,
32:12, 44:23, 53:5, 54:17, 55:18, 56:22
formal [2] - 18:17, 55:14
format [2] - 23:19, 31:5
formatted [3] - 20:6, 20:8, 20:10
forwarded [2] - 8:3, 69:8
forwarding [1] - 7:23
four [4] - 13:23, 28:7, 28:13, 28:17
frame [1] - 26:5, 43:4
France [1] - 8:13
FRANCIS [1] - 3:10
Francis [2] - 3:19, 8:11
frankly [1] - 37:2
front [3] - 47:6, 47:8, 56:13
full [6] - 3:18, 3:19, 8:10, 14:2, 49:3, 68:13
full-time [1] - 14:2

## G

GARY [1] - 1:7
Gary [23] - 2:9, 2:10, 3:16, 6:12, 29:15, 30:17, 33:1, 36:13, 38:15, 40:17, 41:7, 41:8, 41:9, 41:10, 50:11, 50:15, 50:21, 59:5, 59:10, 60:19, 61:12, 62:10, 63:23
general [11] - 7:20, 7:21, 16:20, 17:8, 18:3, 30:14, 30:21, 31:22, 45:5, 61:1, 61:2
generally [1] - 17:13
German [1] - 10:22
GINSBERG [1] - 1:18
Ginsburg [3] - 3:15, 8:1
GINSBURG [12] - 3:2, 3:9, 9:18, 10:5, 17:13, 30:20, 36:2, 41:23, 45:6, 53:17, 66:9, 69:11
Giordano [1] - 1:23
given [1] - 24:2, 35:5
Goggin [1] - 1:21
graduated [2] - 13:5, 13:6
granted [1] - 65:6
greatly [2] - 12:1, 12:2
group [1] - 20:22
guess [5] - 5:16, 22:10, 26:10, 41:5, 50:8, 50:13, 57:12
guidebooks [1] - 18:14

## H

hand [2] - 56:2, 68:15
handled [2] - 46:10, 46:17
handling [1] - 42:19
harass [1] - 52:23
hearing [1] - 6:18
held [2] - 9:5, 10:16
hereby [2] - 67:5, 68:5
hereunto [1] - 68:14
high [1] - 13:3
High [1] - 13:5
hired [1] - 18:18
hold [1] - 9:15
Holding [1] - 11:7
home [1] - 12:12
honest [1] - 44:10
honestly [1] - 56:2
hour [2] - 26:22, 43:10
hourly [1] - 19:21
hours [1] - 55:4
house [3] - 33:18, 35:2, 39:11
hundred [2] - 34:19, 38:22

## I

idea [2] - 40:5, 40:20
Identification [4] - 30:2, 36:8, 50:23, 59:12
identified [8] - 3:11, 9:3, 33:13, 33:15, 34:11, 34:13, 35:15, 49:14
identifies [2] - 21:10, 31:6
Identify [1] - 52:11
identify [7] - 23:10, 41:9, 41:16, 41:17, 46:8, 49:23, 55:2
imagine [2] - 12:1, 57:14
immediately [1] - 47:8
impair [1] - 5:11
improperly [2] - 63:4, 65:20
IN [2] - 1:2, 68:14
in-house [1] - 33:18

**inaccurate** [4] - 27:16, 35:9, 35:13, 38:23
**include** [2] - 31:15, 31:17
**includes** [2] - 15:2, 31:18
**including** [3] - 52:13, 54:9, 58:23
**incomplete** [5] - 35:8, 35:13, 35:19, 37:23, 38:23
**Incorporated** [1] - 11:14
**incorrect** [7] - 25:10, 27:5, 33:10, 33:11, 34:13, 38:17, 62:21
**incorrectly** [1] - 29:11
**India** [3] - 11:22, 12:15, 12:22
**indicate** [1] - 28:10
**indication** [1] - 58:2
**individual** [8] - 22:18, 23:21, 26:22, 32:3, 33:9, 34:8, 39:5, 58:11
**individuals** [2] - 11:19, 34:5
**industry** [1] - 13:19
**influence** [1] - 5:10
**informal** [1] - 5:8
**information** [81] - 7:11, 9:23, 10:6, 18:10, 21:10, 21:11, 21:16, 21:19, 21:20, 21:21, 22:23, 23:4, 23:7, 23:12, 23:18, 23:20, 23:23, 24:12, 24:14, 24:16, 27:5, 27:10, 27:12, 27:14, 27:16, 28:16, 29:1, 29:4, 29:6, 29:10, 30:10, 30:21, 31:7, 31:14, 31:22, 32:1, 33:5, 34:6, 34:7, 35:9, 37:9, 38:3, 38:8, 38:11, 39:1, 39:12, 39:13, 41:10, 41:11, 41:17, 42:5, 42:9, 42:11, 42:13, 42:18, 42:21, 42:23, 43:6, 43:18, 44:19, 47:7, 49:17, 49:23, 51:5, 51:6, 51:8, 51:21, 52:5, 56:12, 59:19, 62:3, 62:4, 62:12, 62:15, 62:16
**initial** [2] - 19:9, 58:22
**initials** [2] - 10:22, 10:23
**initiate** [2] - 20:7, 31:8

**initiated** [2] - 28:5, 58:14
**instance** [2] - 19:4, 21:13
**instruct** [2] - 10:1, 30:18
**INSTRUCTIONS** [1] - 69:1
**instructions** [1] - 18:23
**intended** [2] - 49:5, 52:23
**intent** [2] - 61:4, 61:7
**intention** [2] - 48:8
**intentional** [3] - 47:2, 47:18, 53:23
**Interrogatories** [2] - 2:9, 50:22
**interrogatories** [2] - 7:3, 50:16
**Interrogatory** [1] - 52:10
**interrogatory** [2] - 52:20, 54:8
**interrupt** [1] - 45:3
**involve** [1] - 17:1
**involved** [7] - 14:21, 15:1, 15:11, 44:12, 52:17, 55:5, 58:15
**issue** [1] - 57:1

**J**

**Jacob** [1] - 3:15
**JACOB** [1] - 1:18
**job** [1] - 24:14
**John** [3] - 3:19, 8:11, 8:13
**JOHN** [4] - 1:12, 3:10, 67:5, 69:5
**Jr** [1] - 3:10
**JR** [3] - 1:12, 67:5, 69:5
**jump** [1] - 43:9
**June** [7] - 29:17, 36:11, 38:14, 43:14, 57:19, 60:18, 61:11
**junior** [4] - 8:12, 10:9, 28:22, 41:8
**Junior** [2] - 3:19, 8:13

**K**

**keep** [1] - 28:1
**Kimmel** [5] - 1:18, 3:17, 7:8, 40:11, 64:4
**kind** [2] - 22:1, 65:1

**knowledge** [1] - 60:10

**L**

**lack** [1] - 11:10
**language** [1] - 58:22
**Larry** [1] - 10:10
**last** [8] - 4:18, 9:5, 28:7, 28:13, 28:17, 31:23, 57:13, 60:4
**law** [5] - 40:10, 50:7, 50:9, 57:17, 59:1
**lawsuit** [2] - 65:2, 65:4
**lawyer** [1] - 48:3
**lead** [1] - 52:22
**Leary** [1] - 10:9
**least** [2] - 28:18, 56:13
**legal** [6] - 32:17, 53:4, 54:9, 54:18, 64:11, 64:15
**letter** [62] - 17:7, 20:7, 20:8, 20:16, 20:18, 20:19, 20:20, 20:22, 24:5, 25:4, 29:18, 30:3, 32:23, 35:6, 35:10, 35:11, 36:12, 37:4, 37:5, 37:20, 37:21, 38:15, 38:18, 38:22, 39:5, 39:8, 39:20, 40:4, 42:15, 43:15, 43:20, 43:21, 43:22, 44:2, 44:5, 49:2, 49:4, 49:14, 50:10, 50:13, 55:10, 57:19, 57:21, 57:22, 58:4, 58:12, 58:17, 58:20, 60:19, 61:3, 61:7, 61:12, 61:18, 61:19, 63:2, 63:4, 63:6, 64:5, 64:18, 65:10, 65:21
**Letter/Notice** [2] - 2:7, 29:23
**letters** [37] - 15:6, 17:16, 17:19, 18:1, 18:2, 19:7, 19:8, 19:9, 20:2, 20:3, 20:4, 20:5, 20:11, 20:12, 20:13, 20:19, 22:23, 23:4, 27:7, 27:13, 27:14, 33:23, 36:21, 37:19, 38:21, 43:15, 43:23, 44:6, 44:16, 45:21, 46:16, 49:1, 49:2, 50:3, 58:16
**Lexis** [2] - 22:1, 40:21
**LexisNexis** [11] - 34:2, 34:3, 34:6, 35:20,

36:17, 39:4, 41:6, 42:10, 42:14, 42:17, 61:22
**likely** [1] - 38:5
**limited** [1] - 52:14
**litigation** [1] - 51:12
**live** [2] - 23:14, 23:17
**lived** [1] - 40:18
**living** [1] - 49:20
**locate** [2] - 22:2, 22:14
**located** [2] - 38:6, 40:9
**locating** [1] - 22:7
**location** [4] - 18:10, 24:23, 38:5, 41:9
**Longwater** [2] - 1:15, 8:15
**look** [5] - 22:4, 22:6, 22:20, 23:9, 60:3
**looked** [2] - 60:5, 60:6
**looking** [2] - 39:5, 47:13
**low** [1] - 57:16
**lumped** [1] - 16:14

**M**

**MA** [1] - 1:15
**machine** - 68:9
**mail** [6] - 18:11, 39:10, 44:6, 44:8, 49:1, 50:8
**mailed** [5] - 7:9, 38:4, 44:4, 61:19
**mailing** [4] - 25:2, 35:2, 48:23, 49:14
**mails** [1] - 44:15
**maintenance** [5] - 47:3, 47:19, 48:15, 53:12, 54:1
**majority** [2] - 16:11, 46:14
**Management** [1] - 1:23
**management** [1] - 14:21
**manager** [5] - 12:8, 19:17, 51:12, 57:2
**managers** [2] - 12:3, 12:6
**manages** [1] - 20:11
**manuals** [3] - 17:2, 17:10, 19:1
**March** [2] - 1:15, 69:5
**marked** [16] - 10:3, 29:20, 30:1, 32:23, 36:1, 36:7, 47:9, 49:18, 50:17, 50:22, 57:19, 59:6, 59:12,

60:18, 63:7, 65:10
**married** [1] - 21:14
**Marshall** [1] - 1:20
**Massachusetts** [7] - 1:14, 3:12, 8:16, 10:11, 13:6, 13:12, 68:11
**MASSACHUSETTS** [2] - 68:2, 68:5
**match** - 34:17, 34:22, 34:23
**matching** [1] - 35:1
**materials** [1] - 52:16
**matter** [6] - 3:5, 4:9, 4:12, 7:15, 48:9, 57:1
**MBA** [2] - 13:13, 13:14
**mean** [10] - 18:14, 26:5, 27:6, 35:1, 35:6, 37:1, 41:1, 46:5, 49:11, 50:1
**meaning** [5] - 46:2, 46:3, 51:10, 51:11, 57:6
**meanings** [1] - 32:13
**means** [1] - 62:7
**MEANS** [1] - 68:21
**Media** [1] - 25:3
**media** [1] - 33:22
**mention** [1] - 43:5
**mentioned** [2] - 43:15, 44:20
**method** [1] - 46:9
**Metro** [2] - 25:3, 44:10
**metro** [1] - 33:22
**middle** [1] - 5:19
**might** [11] - 5:6, 19:16, 23:9, 26:21, 38:21, 41:13, 46:9, 46:12, 49:20, 51:13, 62:21
**million** [1] - 26:8
**millions** [4] - 24:11, 25:13, 25:17, 25:20
**mind** [1] - 64:2
**mini** [1] - 58:23
**minute** [1] - 41:19
**Miranda** [1] - 59:1
**misreading** [1] - 53:14, 53:15
**mistake** [1] - 37:7
**Mobility** [17] - 30:4, 30:15, 30:22, 31:3, 32:5, 36:14, 37:13, 37:15, 37:20, 38:8, 38:16, 38:19, 39:9, 39:15, 45:4, 45:7, 61:14
**modified** [1] - 39:11
**modify** [1] - 38:11
**monitored** [1] - 19:17

monitoring [2] - 18:19, 57:15
most [5] - 7:21, 19:20, 28:3, 28:19, 33:20
mostly [3] - 7:12, 44:21, 44:22
motion [2] - 54:19, 65:6
move [1] - 8:5
moves [1] - 21:14
moving [1] - 55:12
MR [36] - 3:4, 7:18, 9:15, 9:18, 9:20, 10:5, 17:4, 17:9, 17:13, 18:15, 22:5, 26:2, 26:4, 30:7, 30:20, 32:11, 36:2, 36:19, 41:21, 41:23, 42:1, 44:23, 45:3, 45:6, 50:5, 53:3, 53:13, 53:17, 53:18, 54:3, 54:16, 55:18, 56:21, 60:15, 66:8, 66:9
multiple [1] - 27:20
must [4] - 5:8, 12:14, 15:9, 19:10

**N**

name [23] - 3:18, 3:19, 8:11, 8:23, 11:8, 20:9, 21:5, 21:13, 25:3, 27:21, 27:23, 31:11, 31:15, 33:14, 35:4, 35:14, 41:7, 41:13, 44:9, 44:11, 62:12, 65:17
named [2] - 22:18, 33:9
names [2] - 4:22, 21:7
nature [2] - 44:19, 44:22
never [2] - 34:14, 40:17
new [9] - 11:3, 20:22, 26:8, 33:15, 39:11, 58:6, 58:19, 63:5
New [1] - 13:7
next [1] - 55:4
non [1] - 54:18
non-attorney [1] - 54:18
nonAmerican [1] - 12:16
nonUnited [1] - 12:16
NORFOLK [1] - 68:3
Norfolk [1] - 68:5
normal [2] - 42:19,

46:10
normally [2] - 6:1, 57:4
Norwell [3] - 1:15, 8:15, 10:10
NOT [1] - 68:20
Notary [4] - 1:14, 3:12, 68:4, 68:9
notes [1] - 58:3
nothing [2] - 20:5, 55:8
Notice [1] - 1:13
notice [8] - 6:11, 6:22, 8:3, 26:20, 58:21, 58:23, 59:1, 60:6
notices [1] - 34:16, 58:8
notwithstanding [5] - 47:3, 47:19, 48:15, 53:11, 54:1
November [1] - 68:19
number [21] - 4:19, 9:12, 17:5, 23:10, 24:2, 24:4, 25:10, 28:8, 28:9, 28:15, 28:20, 31:21, 32:13, 54:20, 57:9, 57:11, 58:9, 58:20, 59:2, 62:4
numbers [1] - 28:13
numerous [2] - 20:18, 62:2

**O**

object [5] - 7:18, 30:7, 30:8, 36:19, 53:5
objected [1] - 52:20
objection [23] - 3:6, 7:22, 9:15, 9:16, 9:19, 9:21, 10:2, 17:4, 17:14, 18:15, 22:5, 26:2, 26:4, 30:18, 32:11, 32:12, 44:23, 50:5, 53:13, 54:17, 55:7, 55:18, 56:21
objections [5] - 7:2, 7:4, 50:15, 53:4, 59:5
Objections [4] - 2:9, 2:10, 50:20, 59:9
objects [1] - 54:8
obligation [1] - 61:8
obtain [4] - 31:2, 39:22, 43:5, 62:2
obvious [1] - 29:13
obviously [3] - 3:7, 17:12, 63:11

occasion [1] - 57:3
occasions [1] - 20:21
occurrence [1] - 5:13
October [2] - 35:23, 46:21
OF [9] - 1:3, 1:12, 67:11, 67:12, 68:2, 68:3, 68:20, 68:20, 68:21
offhand [1] - 51:15
office [13] - 11:22, 12:1, 12:4, 12:5, 12:6, 12:7, 12:11, 12:14, 31:5, 40:10, 50:10, 51:20
officer [3] - 9:4, 9:8, 64:3
officers [3] - 9:10, 10:1, 10:7
offices [4] - 1:14, 11:20, 11:21, 12:16
often [1] - 57:6
once [3] - 3:16, 57:4, 63:5
one [11] - 8:18, 11:22, 12:13, 26:17, 27:17, 30:12, 31:18, 33:7, 41:9, 57:18, 59:21
ongoing [1] - 18:21
open [4] - 49:22, 50:7, 63:3, 64:4
opened [5] - 50:3, 50:10, 50:12, 64:18, 65:20
operations [2] - 15:6, 20:21
opinion [1] - 64:2
opportunity [2] - 19:23, 42:6
oppress [1] - 52:23
order [3] - 17:20, 23:11, 43:12
orderly [1] - 6:8
organized [1] - 12:5
ORIGINAL [1] - 69:10
original [5] - 11:2, 33:10, 33:12, 34:12, 37:3
otherwise [3] - 7:22, 24:17, 66:4
outside [2] - 14:11, 22:15
overly [2] - 52:21, 54:10
oversee [1] - 14:20
owed [2] - 18:6, 26:9
owes [1] - 61:8
own [5] - 15:21, 15:22, 19:16
owned [1] - 44:21

owner [1] - 22:19
owns [4] - 15:16, 16:2, 16:4, 26:11

**P**

P.C [2] - 1:18, 1:21
p.m [2] - 1:15, 66:12
PA [3] - 1:19, 1:21, 61:13
page [3] - 47:15, 69:6, 69:8
Page [5] - 2:5, 36:9, 46:23, 47:12, 52:10
paid [6] - 19:18, 19:20, 26:14, 26:19, 26:22, 32:9
PAINS [1] - 67:11
Paragraphs [1] - 36:9
parent [5] - 10:23, 11:3, 11:6, 11:7, 11:11
part [8] - 9:2, 16:20, 19:1, 19:20, 28:3, 42:16, 44:12, 58:9
partial [1] - 35:5
partially [1] - 15:17
particular [11] - 24:21, 39:14, 42:16, 43:18, 45:4, 46:1, 46:2, 51:14, 55:6, 63:17, 64:20
particularity [1] - 52:11
parties [5] - 16:22, 17:17, 17:19, 18:2, 63:19
party [24] - 15:19, 16:6, 18:10, 21:2, 33:19, 33:21, 43:17, 44:4, 44:15, 48:22, 49:5, 49:22, 55:16, 56:1, 56:6, 61:4, 63:21, 64:4, 64:6, 64:16, 64:17, 66:3
pass [2] - 19:10, 49:21
passed [1] - 63:9
past [7] - 14:14, 32:16, 52:2, 55:17, 55:23, 56:5, 57:8
Paul [2] - 10:9, 10:10
payment [1] - 31:23
PENALTIES [1] - 67:11
pending [1] - 54:19
PENNSYLVANIA [1] - 1:3
Pennsylvania [3] - 3:5, 33:2, 40:5

people [7] - 11:23, 23:14, 23:17, 23:22, 50:2, 57:16, 59:22
per [2] - 25:17, 26:19
percent [5] - 13:12, 16:4, 16:5, 26:11, 34:19
percentage [1] - 16:2
period [6] - 9:2, 13:20, 13:23, 14:2, 32:9, 32:21
periodic [1] - 18:18
PERJURY [1] - 67:11
person [12] - 20:11, 28:11, 33:14, 51:4, 51:13, 52:16, 56:23, 57:1, 57:4, 60:1, 63:9, 64:3
personal [6] - 44:21, 45:9, 45:11, 45:14, 45:15, 45:23
personally [1] - 29:12
pertaining [2] - 33:5, 49:6
Philadelphia [1] - 1:21
phone [11] - 18:12, 18:20, 19:6, 23:2, 23:10, 24:2, 24:4, 25:9, 46:14, 62:4
phones [1] - 24:12
phrase [1] - 48:1
phrased [1] - 42:12
physically [1] - 12:11
pieces [1] - 31:7
Pike [1] - 1:19
place [4] - 10:3, 17:3, 18:5, 32:8, 37:23, 48:19, 54:5, 54:14, 68:7, 68:9, 68:13
placed [3] - 21:8, 37:17, 58:7
Placement [2] - 2:7, 30:1
placement [2] - 31:14, 46:10, 58:19
Plaintiff [8] - 1:7, 1:13, 1:19, 2:9, 2:10, 3:16, 50:20, 59:9
plaintiff [4] - 30:9, 37:10, 63:12, 63:14
plaintiff's [2] - 7:2, 7:4
Plaintiff's [2] - 2:7, 36:5
planning [1] - 14:22
plugged [1] - 62:10
point [3] - 17:9, 30:8, 39:9
pointed [1] - 43:4
policies [1] - 49:6
policy [1] - 49:10

**populates** [1] - 23:21
**portion** [1] - 38:13
**position** [8] - 3:20, 8:18, 8:20, 8:22, 9:5, 14:9, 48:18, 53:1
**possession** [1] - 30:23
**possibility** [2] - 50:9, 62:20
**possible** [4] - 39:22, 40:22, 50:13, 51:13
**possibly** [1] - 19:15
**Postal** [1] - 25:8
**postgraduate** [2] - 13:3, 13:10
**potentially** [1] - 33:9
**practical** [1] - 19:15
**pre** [1] - 20:10
**pre-formatted** [1] - 20:10
**precise** [1] - 4:6
**prefixes** [1] - 28:22
**preliminary** [1] - 38:3
**prepare** [1] - 51:17
**prepared** [2] - 51:7, 69:5
**preparing** [1] - 8:7
**PRESENT** [1] - 1:23
**present** [2] - 30:13, 68:7
**president** [7] - 3:22, 8:17, 8:19, 10:8, 14:5, 14:19, 51:11
**President** [1] - 1:23
**presumably** [2] - 49:13, 63:8
**presumed** [1] - 33:11
**primary** [1] - 49:16
**printed** [1] - 42:17
**privately** [1] - 10:16
**privilege** [2] - 3:7, 5:23
**privileged** [1] - 7:19
**probation** [1] - 57:5
**problems** [1] - 54:21
**procedure** [3] - 48:5, 48:11, 63:2
**procedures** [11] - 15:9, 47:3, 47:19, 48:15, 48:19, 48:21, 49:12, 53:12, 54:2, 54:5, 54:14
**proceeding** [2] - 68:8, 68:11
**proceedings** [2] - 66:11, 68:13
**process** [20] - 18:21, 19:5, 23:1, 23:5, 23:6, 23:18, 24:21, 33:15, 33:18, 37:18,

37:19, 37:21, 38:7, 38:18, 40:2, 41:16, 44:2, 44:7, 44:12, 58:10
**processer** [1] - 44:8
**processes** [4] - 24:20, 38:10, 49:12, 61:23
**product** [2] - 38:9, 39:10
**Production** [3] - 2:11, 59:5, 59:11
**production** [1] - 7:5
**Professional** [3] - 1:13, 68:10, 68:18
**program** [4] - 13:13, 57:15, 57:16
**programs** [1] - 22:12
**project** [1] - 26:21
**proprietary** [2] - 9:23, 61:23
**protocol** [1] - 58:7
**proves** [1] - 27:16
**provide** [6] - 23:12, 24:13, 25:4, 26:21, 27:11, 62:4
**provided** [25] - 13:22, 27:15, 27:17, 29:1, 29:3, 31:11, 33:8, 36:13, 37:9, 37:13, 37:14, 37:18, 37:20, 38:4, 38:8, 38:16, 38:19, 39:15, 42:22, 49:17, 51:14, 58:22, 61:14, 62:19, 63:6
**provider** [1] - 44:11
**providers** [1] - 44:6
**provides** [2] - 33:23, 52:12
**providing** [4] - 26:23, 27:18, 37:5, 52:17
**public** [5] - 42:5, 61:17, 61:20, 62:6, 65:11
**Public** [4] - 1:14, 3:12, 68:4, 68:9
**publicly** [2] - 10:13, 10:18
**pull** [2] - 42:17, 42:23
**pulled** [1] - 42:21
**purchases** [1] - 15:14
**purchasing** [2] - 14:23, 15:12
**purpose** [1] - 46:15
**purposes** [1] - 46:14
**pursuant** [1] - 1:13
**put** [7] - 9:16, 21:1, 21:5, 32:11, 32:12, 54:16, 57:5
**putting** [1] - 20:9

**Q**

**questions** [9] - 6:5, 43:8, 43:12, 54:17, 60:14, 60:22, 60:23, 65:6, 66:10
**quickly** [1] - 63:11
**quite** [1] - 22:10

**R**

**raise** [1] - 17:14
**raised** [1] - 53:10
**rather** [1] - 33:18
**reach** [1] - 40:22
**read** [11] - 36:14, 47:5, 47:16, 47:20, 49:23, 51:3, 51:23, 52:2, 52:6, 53:19, 67:6
**reading** [3] - 52:17, 53:19, 69:7
**READING** [1] - 69:1
**reads** [2] - 36:10, 46:23
**real** [1] - 46:13
**reask** [1] - 45:1
**reason** [5] - 17:5, 40:16, 45:19, 49:15, 49:19
**reasonably** [7] - 47:4, 47:20, 48:16, 52:21, 53:12, 54:2, 54:11
**reasons** [1] - 17:5
**receive** [1] - 26:8
**received** [4] - 7:14, 13:4, 49:19, 63:8
**receives** [1] - 52:12
**recently** [1] - 52:1
**Recess** [1] - 55:16
**recipient** [1] - 49:21
**recognize** [1] - 63:13
**record** [8] - 9:16, 41:23, 42:5, 61:17, 62:6, 65:11, 65:12, 67:8
**records** [6] - 36:11, 37:11, 37:14, 37:16, 42:7, 61:20
**Recross** [1] - 2:2
**Redirect** [1] - 2:2
**redundant** [1] - 5:6
**refer** [4] - 8:4, 46:20, 50:14, 52:9
**referenced** [2] - 4:13, 7:13
**referring** [2] - 42:14, 64:21
**reflect** [3] - 36:11,

37:11, 37:14
**regarding** [5] - 16:22, 17:16, 18:8, 27:5, 42:4
**Registered** [3] - 1:13, 68:10, 68:18
**regulatory** [1] - 55:13
**relating** [2] - 4:14, 30:11
**relative** [6] - 7:11, 28:5, 31:8, 32:1, 42:18, 43:3
**relevant** [2] - 53:2, 54:13
**rely** [1] - 24:15
**relying** [1] - 24:13
**remaining** [1] - 36:23
**remember** [5] - 4:21, 8:5, 42:12, 55:21, 56:10
**remote** [1] - 12:12
**remotely** [1] - 12:13
**report** [3] - 41:12, 51:5, 68:13
**reporter** [1] - 6:3
**REPORTER** [1] - 68:21
**Reporter** [3] - 1:14, 68:11, 68:18
**reporting** [1] - 13:23
**representative** [1] - 6:12
**representatives** [1] - 22:13
**representing** [1] - 26:8
**REPRODUCTION** [1] - 68:20
**Request** [3] - 2:11, 59:5, 59:10
**request** [3] - 7:4, 20:23, 54:13
**requested** [3] - 58:4, 58:5, 58:6
**required** [2] - 58:21, 59:1
**research** [4] - 42:16, 42:20, 51:14, 56:3
**researched** [1] - 51:7
**reserve** [2] - 3:6, 7:22
**residential** [1] - 40:14
**respect** [7] - 17:10, 42:7, 48:23, 54:19, 62:10, 63:2, 63:23
**respective** [1] - 28:1
**responds** [1] - 24:3
**response** [4] - 36:23, 42:7, 54:20, 59:21
**Responses** [2] - 2:10, 59:8

**responses** [8] - 7:3, 50:16, 51:2, 59:4, 59:13, 59:16, 60:7
**responsibility** [1] - 9:2
**result** [5] - 48:12, 53:11, 61:17, 61:20, 61:21
**resulted** [4] - 47:2, 47:18, 48:1, 53:23
**retaining** [3] - 49:7, 49:8, 49:9
**retrained** [1] - 57:2
**revealing** [3] - 20:14, 26:1, 33:4
**review** [1] - 15:7
**reviewed** [7] - 8:6, 44:1, 51:17, 51:18, 59:19, 59:21, 60:12
**Risk** [1] - 1:23
**risk** [1] - 14:21
**ruled** [1] - 66:4
**run** [2] - 23:17, 25:5

**S**

**safeguard** [2] - 27:9, 27:12
**safeguards** [1] - 27:7
**SAME** [1] - 68:20
**satisfactorily** [1] - 3:11
**school** [1] - 13:3
**School** [1] - 13:5
**schwartz** [2] - 7:15, 51:8
**SCHWARTZ** [28] - 1:20, 3:4, 7:18, 9:15, 9:20, 17:4, 17:9, 18:15, 22:5, 26:2, 26:4, 30:7, 32:11, 36:19, 41:21, 42:1, 44:23, 45:3, 50:5, 53:3, 53:13, 53:18, 54:3, 54:16, 55:18, 56:21, 60:15, 66:8
**Schwartz** [7] - 5:22, 7:1, 8:1, 42:2, 60:14, 60:17, 69:6
**scripts** [1] - 15:5
**seal** [1] - 68:15
**search** [10] - 22:8, 36:17, 40:21, 41:13, 61:18, 61:20, 61:22, 62:6, 62:9, 65:12
**second** [2] - 36:10, 46:22
**secret** [1] - 20:15
**secrets** [1] - 26:1
**Security** [3] - 28:8,

77

28:13, 31:21
**see** [7] - 25:6, 33:1, 36:23, 42:22, 44:7, 51:18
**seeking** [1] - 62:3
**seminars** [2] - 17:2, 18:14
**send** [19] - 17:19, 18:1, 18:2, 20:7, 20:12, 24:8, 24:10, 34:9, 34:17, 35:19, 37:19, 38:21, 38:22, 39:1, 44:6, 49:2, 61:3, 61:4, 62:14
**sending** [12] - 19:6, 22:23, 23:4, 24:6, 26:20, 27:13, 27:14, 34:16, 35:10, 39:8, 58:15, 62:21
**Senior** [1] - 41:11
**senior** [3] - 9:3, 28:23, 41:8
**sent** [34] - 7:7, 17:7, 17:16, 20:10, 22:15, 23:7, 23:19, 27:8, 34:9, 36:12, 37:12, 37:21, 38:11, 38:15, 39:20, 40:4, 42:15, 43:16, 45:21, 50:3, 51:19, 57:21, 57:23, 58:4, 58:8, 58:17, 59:2, 59:17, 59:19, 60:19, 61:12, 65:10, 65:14, 69:6
**SENT** [1] - 69:11
**sentence** [1] - 36:10
**separate** [3] - 16:16, 16:17, 46:9
**separated** [1] - 16:13
**separately** [1] - 16:14
**Service** [1] - 25:8
**service** [4] - 26:23, 32:1, 32:19, 32:20
**services** [4] - 3:23, 8:19, 13:22, 13:23
**set** [1] - 31:15
**setting** [2] - 5:8, 29:2
**settled** [1] - 43:2
**sheet** [2] - 69:6, 69:8
**short** [1] - 8:2
**shorthand** [1] - 68:9
**show** [1] - 42:21
**showed** [1] - 40:21
**showing** [1] - 42:11
**sign** [1] - 44:2
**signature** [2] - 69:6, 69:8
**SIGNED** [1] - 67:11
**SIGNING** [1] - 69:1
**signing** [1] - 69:7

**Silverman** [5] - 1:18, 3:17, 7:8, 40:11, 64:4
**simply** [1] - 62:11
**site** [1] - 26:21
**sitting** [1] - 24:12
**situation** [1] - 65:10
**situations** [1] - 31:10
**six** [1] - 9:5
**skip** [13] - 22:2, 22:9, 22:22, 23:3, 33:7, 33:15, 33:17, 33:20, 34:1, 38:1, 38:2, 39:17
**so-called** [1] - 58:20
**Social** [3] - 28:8, 28:10, 28:12
**social** [1] - 31:21
**solely** [1] - 46:8
**someone** [7] - 21:13, 21:14, 24:3, 24:6, 25:9, 27:6, 57:20
**sometime** [1] - 43:6
**sometimes** [1] - 21:19
**sorry** [12] - 6:18, 8:2, 9:15, 11:10, 16:13, 22:12, 26:6, 35:17, 45:3, 53:14, 56:21, 62:8
**source** [2] - 22:16, 41:12
**sources** [1] - 27:11
**specializes** [1] - 27:17
**specific** [9] - 17:15, 17:23, 18:6, 21:21, 26:6, 29:13, 30:16, 55:6
**specifically** [4] - 51:16, 56:1, 59:23, 61:1
**specifics** [1] - 62:10
**speculate** [1] - 41:15
**speculating** [1] - 29:7
**staff** [7] - 12:9, 15:6, 51:7, 51:9, 51:10, 59:21, 59:23
**staffing** [2] - 12:7, 26:21
**stand** [1] - 10:21
**standard** [1] - 43:21
**start** [5] - 6:6, 8:9, 19:4, 19:6, 30:10
**started** [4] - 37:19, 38:7, 38:18, 45:1
**starting** [2] - 13:2, 39:9
**starts** [1] - 18:20
**state** [3] - 3:18, 8:18, 56:4
**STATE** [1] - 68:2

**State** [2] - 68:5, 68:11
**statement** [4] - 36:16, 38:13, 38:14, 38:17
**States** [3] - 11:21, 12:16, 35:3
**STATES** [1] - 1:2
**statute** [1] - 63:13
**staying** [1] - 16:20
**stepson** [2] - 65:15, 65:20
**still** [5] - 11:5, 25:7, 32:5, 50:3, 52:5
**stipulations** [2] - 3:3, 3:8
**strategic** [1] - 14:22
**strategy** [1] - 46:17
**Street** [1] - 1:21
**strictly** [1] - 23:15
**subject** [6] - 5:23, 6:11, 7:15, 48:9, 55:12, 63:9
**subscribed** [1] - 68:15
**subsequent** [1] - 42:15
**subsidiary** [1] - 10:18
**sufficiency** [1] - 54:20
**suffixes** [1] - 28:22
**supervisors** [1] - 12:4
**supplied** [2] - 33:7, 51:4
**supplies** [1] - 31:13
**supply** [2] - 21:11, 51:6
**supposed** [1] - 36:22
**Susan** [1] - 1:23
**sworn** [1] - 3:11
**symbolized** [1] - 11:1
**system** [4] - 21:1, 38:1, 45:18

## T

**tactics** [2] - 15:5, 46:17
**technology** [2] - 22:2, 22:9
**telephone** [3] - 17:6, 17:10, 31:21
**templates** [1] - 37:4
**term** [2] - 32:12, 32:17
**terminated** [2] - 32:20, 57:8
**test** [1] - 19:10
**testified** [1] - 3:13
**testify** [1] - 37:1
**testimony** [2] - 67:7, 67:8
**THE** [8] - 1:2, 1:3, 67:11, 68:20, 68:20,

68:21, 68:21, 69:10
**theories** [1] - 41:2
**theorize** [1] - 41:5
**thereafter** [1] - 68:11
**therefore** [1] - 33:14
**therein** [1] - 68:7
**third** [26] - 15:18, 16:6, 16:22, 17:17, 17:19, 18:2, 18:10, 21:2, 33:19, 33:21, 43:16, 44:4, 44:15, 48:22, 55:16, 56:1, 56:6, 63:19, 63:21, 64:4, 64:6, 64:16, 64:17, 66:3
**third-party** [7] - 33:21, 56:1, 56:6, 64:6, 64:17, 66:3
**THIS** [2] - 67:12, 68:20
**thousand** [2] - 38:21, 56:16
**three** [5] - 4:21, 14:3, 14:8, 14:10, 55:4
**threshold** [1] - 20:1
**thresholds** [1] - 19:22
**throughout** [2] - 11:20, 35:3
**Thursday** [1] - 1:15
**tight** [1] - 57:15
**timing** [2] - 52:14, 55:3
**title** [2] - 9:1, 11:2
**TO** [3] - 68:20, 69:10, 69:11
**today** [6] - 5:22, 6:21, 8:2, 52:1, 52:2, 60:4
**today's** [1] - 6:16
**together** [1] - 16:15
**tolerance** [1] - 57:16
**took** [2] - 41:19, 68:13
**touch** [1] - 61:8
**trace** [8] - 33:8, 33:15, 33:17, 33:20, 34:1, 38:2, 39:17
**tracing** [5] - 22:2, 22:9, 22:22, 23:4, 38:1
**trade** [2] - 20:14, 26:1
**traded** [2] - 10:13, 10:19
**trained** [1] - 12:5
**trainer** [1] - 57:2
**trainers** [1] - 19:1
**training** [32] - 12:8, 12:9, 16:21, 17:1, 17:2, 17:16, 17:18, 17:20, 17:22, 17:23, 18:4, 18:9, 18:13, 18:17, 18:19, 18:20, 19:3, 19:5, 19:9,

19:14, 52:12, 52:14, 52:16, 52:17, 54:9, 54:10, 55:3, 55:5, 55:9, 57:1, 57:15
**traipse** [1] - 9:22
**transcribed** [1] - 68:12
**transcript** [4] - 67:6, 67:7, 68:12, 69:5
**TRANSCRIPT** [2] - 68:20, 69:10
**transcription** [1] - 68:12
**transmission** [2] - 20:10, 31:4
**treatment** [1] - 46:16
**trouble** [1] - 6:18
**true** [2] - 67:8, 68:13
**truthful** [2] - 5:8, 5:12
**try** [2] - 6:5, 23:9
**trying** [3] - 22:14, 24:12, 41:8
**turn** [1] - 60:18
**turns** [2] - 48:7, 48:13
**type** [2] - 18:13, 31:22
**types** [1] - 27:1
**typical** [1] - 3:8
**typically** [1] - 12:8

## U

**U.S** [1] - 25:7
**ultimate** [1] - 20:17
**unauthorized** [1] - 64:6
**under** [3] - 3:5, 5:10, 68:11
**UNDER** [2] - 67:11, 68:21
**underlying** [1] - 29:14
**understood** [4] - 19:14, 30:20, 42:4, 48:12
**unduly** [2] - 52:21, 54:10
**unique** [1] - 28:2
**United** [2] - 11:20, 35:3
**UNITED** [1] - 1:2
**UNLESS** [1] - 68:21
**unless** [2] - 27:5, 49:2
**unlikely** [1] - 35:12
**unpaid** [1] - 32:21
**unsuccessful** [1] - 26:10
**up** [13] - 22:4, 22:6, 23:9, 24:16, 29:2, 30:22, 31:15, 34:17, 34:23, 35:1, 40:21, 60:13

**update** [3] - 21:22, 38:10, 39:4
**updated** [2] - 21:15, 23:20
**updates** [2] - 21:18, 23:20
**USA** [1] - 11:7
**uses** [2] - 43:22, 46:13
**utilized** [1] - 38:20
**utilizes** [1] - 41:6

## V

**valid** [4] - 22:17, 25:7, 33:13, 48:11
**validated** [2] - 27:10, 35:20
**validating** [1] - 22:23
**validation** [1] - 58:23
**value** [1] - 32:2
**varies** [2] - 12:1, 12:2
**various** [2] - 31:6, 31:7
**vary** [1] - 28:16
**vending** [1] - 22:16
**vendor** [8] - 23:19, 24:18, 25:4, 27:9, 33:19, 38:22, 44:14, 61:21
**vendors** [4] - 15:8, 33:8, 33:21, 43:17
**verification** [3] - 25:1, 34:16, 39:4
**verified** [1] - 35:20
**verify** [7] - 22:16, 23:22, 24:7, 24:12, 28:6, 28:9, 45:18
**verifying** [1] - 24:9
**vice** [6] - 3:22, 8:17, 8:19, 14:5, 14:19, 51:11
**Vice** [1] - 1:23
**vice-president** [6] - 3:22, 8:17, 8:19, 14:5, 14:19, 51:11
**violate** [5] - 30:19, 50:7, 56:17, 56:19, 57:17
**violated** [1] - 65:8
**violates** [1] - 56:23
**violation** [10] - 30:12, 46:23, 47:16, 53:10, 53:16, 53:22, 54:6, 63:14, 63:17, 66:1
**violations** [3] - 56:6, 56:7, 57:8
**visual** [1] - 52:15
**Vs** [1] - 1:8

## W

**wage** [1] - 19:21
**wait** [1] - 6:4
**Walnut** [1] - 1:21
**Warner** [1] - 1:21
**warning** [1] - 57:3
**Watts** [1] - 64:22
**ways** [2] - 26:16, 26:18
**week** [4] - 19:16, 52:3, 60:4, 60:5
**Wellesley** [1] - 13:11
**WERE** [1] - 69:10
**Weymouth** [1] - 13:5
**WHEREOF** [1] - 68:14
**whole** [1] - 28:19
**wife's** [1] - 41:13
**wish** [1] - 60:7
**Witness** [1] - 2:2
**witness** [2] - 67:1, 68:6
**WITNESS** [2] - 68:14, 69:1
**words** [1] - 35:1
**wraps** [1] - 60:13
**write** [2] - 19:8, 19:9
**writing** [3] - 19:7, 55:10, 68:9
**written** [4] - 17:11, 49:6, 49:10, 57:3
**wrongdoing** [1] - 54:4
**wrote** [1] - 53:7

## Y

**year** [10] - 4:18, 13:8, 25:18, 25:21, 26:6, 55:17, 55:23, 56:5, 57:8, 57:13
**years** [9] - 8:21, 9:5, 14:1, 14:2, 14:3, 14:6, 14:8, 14:10, 44:13
**York** [1] - 13:7
**yourself** [1] - 13:1